Charles VENEZIA, Petitioner,

v.

UNITED STATES of America,
Respondent.

Civ. A. No. 95–1388 (DRD).

Crim. No. 94–94 (DRD).

United States District Court,
D. New Jersey.

May 17, 1995.

Bochetto & Lentz, P.C., Moorestown, NJ by Gavin P. Lentz, for petitioner.

Faith S. Hochberg, U.S. Atty., Newark, NJ by Andrew Leven, Asst. U.S. Atty., for respondent.

## OPINION

DEBEVOISE, Senior District Judge.

Petitioner, Charles Venezia, filed his petition pursuant to 28 U.S.C. § 2255 seeking an order vacating his sentence and setting a new sentencing hearing before a "new" judge. The ground for the relief claimed is ineffective assistance of counsel at the original sentencing.

### I. Prior Proceedings

On March 10, 1994, petitioner pleaded guilty to a one-count information charging him with a dual object conspiracy to defraud the United States and to commit wire fraud between in and around March 1987 through in or around September 1989.

The Probation Department prepared a Presentence Investigation Report dated June 22, 1994 (the "PSR"). The PSR set forth in considerable detail the nature and extent of the fraud which petitioner perpetrated.

In broad outline, petitioner used a number of trucking companies owned and organized by him to defraud, first, the General Service Administration ("GSA") and, then, a factoring company, First Southern Financial Services, Inc. ("First Southern").

Petitioner defrauded GSA routinely by overcharging for freight hauled for that agency by one of his companies. After GSA audited the invoices and discovered the overcharges, it would seek to recapture the overcharges by crediting them against future invoices submitted by petitioner's company. To prevent this recapture; petitioner would close down the active company and activate a new one, disguising his ownership. The new company entered into contracts with GSA and resumed the practice of overcharging until detected, at which time the cycle would begin again.

The fraud which petitioner perpetrated upon First Southern was to sell to it the inflated invoices, knowing that GSA most likely would not pay them.

These fraudulent actions were carried out during 1987 and into 1989. GSA's losses amounted to $311,000 and First Southern's losses amounted to $578,000.

The PSR disclosed the complex nature of the transactions required to implement the scheme.

The PSR also provided information about petitioner, his family, his financial situation, his criminal record and, of importance in this proceeding, his gambling activities.

Petitioner was a heavy gambler. In 1988 and 1989 he had more than $500,000 in "play" in Harrah's Casino. With reluctance, he admitted to the probation officer preparing his PSR that he had a gambling problem and asserted that it was a disease which led to his criminal involvement.

Using the 1988 Guidelines, the PSR computed petitioner's total offense level as follows:

| | |
|---|---:|
| Base offense level | +6 |
| Additional points because loss was between $500,000 and $1,000,000 | +8 |
| More than minimal planning | +2 |
| Organizer, leader, etc. | +2 |
| Acceptance of responsibility | −2 |
| Total offense level | 16 |

The PSR determined petitioner's criminal history category to be at level II. This was based upon four bad check violations committed between August 11, 1989 and April 2, 1991.

Not counted towards the criminal history calculations were eight crimes which petitioner committed between May 30, 1989 and February 8, 1992, and for which petitioner had pleaded guilty and was awaiting sentence. The crimes were third degree theft (4 violations), fourth degree bad checks (3 violations) and second degree theft (1 violation). The PSR noted that, if the offenses for which petitioner was awaiting sentence were included, 6 points would be added to the 2 points for his previous convictions and his criminal history category would have been IV.

The PSR set forth personal data about petitioner and his family. With respect to his mental and emotional health, the PSR stated:

There is no reported evidence that the defendant has ever received psychological or psychiatric care, and he regards himself as emotionally stable.

The defendant admits that he had a gambling problem several years ago, which is correlated to his criminal involvement. He also admits that he failed to view his gambling habit as a problem at that time, and could have benefited from counseling. As a condition of Pretrial Services, Venezia was evaluated by Anne Krutul at the Family Counseling Associates in Kinnelon, New Jersey on April 7, 1994, to determine if he has a gambling problem, and therefore in need of treatment. During the evaluation, Venezia stated that "his father-in-law was the one who introduced him to the world of track," which gradually progressed to other forms of gambling. He admitted that as his addiction deepened, he gambled increasingly large amounts of money, ranging from $1,000 to $10,000 utilizing credit cards and "anything else he could get his hands on." He further admitted that "he ended up cashing in all his stocks and bonds, passing bad checks, and maxing out a credit line with his bookie and a casino." It was recommended that Venezia attend gambling anonymous, and to date, has attended several meetings. The defendant has described this as a positive experience and indicated that he is motivated towards continued treatment.

Prior to sentencing, petitioner's attorney, Clifford E. Lazzaro, Esq., submitted a psychiatric report prepared by Valerie C. Lorenz, Ph.D., CPC, Executive Director of Compulsive Gambling Center, Inc. Mr. Lazzaro had sent petitioner to the Center for evaluation. Dr. Lorenz had specialized in the field of pathological gambling, i.e., compulsive gambling, for more than 20 years as researcher, therapist and educator. Among the conclusions set forth in the report are the following:

### Mental Status Exam

Mr. Venezia is a 49–year–old white male, currently separated from his wife of 26 years. He formerly worked primarily in the trucking and warehouse business, although he is currently unemployed. He was alert, oriented in the three spheres (time, person, and place) and memory (remote, recent and current) was intact. He was quickminded, intelligent, manipulative, superficial, displaying no warmth and lacking in emotional content. He repeatedly stated "I have no feelings. I don't know what is normal." These statements appeared to be sincere.

There was no obvious depression, although he scored 23 (moderate level) on the Beck Depression Inventory and both the MMPI and the Millon indicated an elevated enduring level of depression. There was no lability and no racing of thoughts. Psychomotor activity was within normal limits. There was no suicidal, homicidal or paranoid ideation.

He was highly narcissistic and self-centered. The content of speech was noted for high overgeneralization, exaggeration, and denial. He displayed a positive "I can overcome" attitude, which was also noted for its lack of sensitivity to emotional impact to adversity suffered by others.

There was also little sense of conscience, despite cooperatively knowing right from wrong, thus no remorse. Strong sociopathic traits were noted, such as a lack of loyalty, trust, social conscience, remorse or guilt.

\* \* \* \* \* \*

### Test Results

Test results of the Millon typically are about 85% accurate with compulsive gamblers. Mr. Venezia's test results are valid. Findings on the Millon are:

"This may may be identified by his disdain for the welfare of others, his neonempathic, prejudiced, and self-dentered attitudes, his socially intimidating manner, and his voiced pride in self-reliance, unsentimentality, and competitive values. These behaviors hide his deep insecurity about his self-worth and are employed to counteract past and anticipated humiliation and rejection. Deeply felt resentment is projected outward, precipitating frequent squabbles, antagonis, and personal and family abuse.

"The patient is unlikely to be a willing participant in therapy, most probably agreeing to therapy under the pressure of marital, vocational, or legal difficulties.

"Among specific therapeutic techniques are drugs that may modulate both the threshold and intensity of reactivity. Such changes may minimize the frequency and depth of the patient's hostile feelings and thereby ... lead to less destructive outlets."

The MMPI was also a valid test. Findings on it state: "The client appears to have long-standing impulse-control problems. Extroverted, uninhibited, and rather self-indulgent, he has a low frustration tolerance and a need for constant stimulation that cause him to behave recklessly or irresponsibly.

He is preoccupied with feeling guilty and unworthy.... He feels hopeless at times.... He has difficulty managing routine affairs.... He appears to be immobilized and withdrawn, and has no energy for life."

His projective tests also reflect impulsivity, at times drawing with little or no thought to his imagery. Both mandalas in color and form reveal intense feelings of anger with self, which he however denies. He says he has lost all feelings. (These drawings are similar to those often seen in patients suffering from Post Traumatic Stress Disorder).

Dr. Lorenz concluded that petitioner "has developed a pathological gambling disorder, which led to numerous illegal acts, to which he has pled guilty. Clinically, although he is suffering from narcissistic personality disorder, he is also suffering from Post Traumatic Stress Disorder, as a consequence of poor emotional development and as a consequence of serving in combat in Vietnam." Dr. Lorenz noted that "[n]umbing of emotions, poor interpersonal relationships, and addictive disorders are symptoms of Post Traumatic Stress Disorder." Dr. Lorenz recommended that any sentencing be accompanied by a mandate for treatment, opining that "incarceration is punitive and will do little to rehabilitate this individual."

I reviewed the PSR and Dr. Lorenz's report before the sentencing date, and both defense counsel and counsel for the government had reviewed and commented on the documents.

Sentencing occurred on September 12, 1994. The government had moved for an upward departure because, by reason of the large number of convictions on which petitioner had not yet been sentenced, his criminal history category did not adequately reflect the seriousness of his past criminal conduct or the likelihood that he would commit other crimes.

Petitioner's attorney argued against an upward departure. There was no need to address the PSR because it accurately sets forth all the relevant information, and it was in petitioner's interests that I follow its conclusions strictly rather than departing from it by granting the government's motion for an upward departure.

The psychiatric report presented a dilemma for defense counsel; it described petitioner's compulsive gambling, the results of which may have put pressure on him to pursue his fraudulent schemes, but it also revealed him to be a manipulative, narcissistic person inclined to blame others or outside circumstances for his wrong doing. It, together with his self-justifying comments to his probation officer, might have been a basis for an argument that he had not accepted responsibility for his conduct. On the other hand, the psychiatric report might have provided a basis for leniency within the Guideline range and for a recommendation that petitioner receive psychiatric treatment while incarcerated. Defense counsel treated the report with care during his presentation to the Court, stating:

Judge, you're very familiar with the facts of this case and of my client's prior criminal history. He has accepted responsibility. I believe that he has shown remorse. He understands that there is a possible disease which he suffers from which caused him to perhaps act in this fashion. He by no means offers the report prepared by Dr. Lorenz for compulsive gambling as an excuse for his criminal conduct. However, he only requests of the Court that if incarcerated, that there be some special program that he may be allowed to participate in so that he may help himself with his present affliction.

After hearing the presentations of counsel and after hearing petitioner, I concluded that an upward adjustment based on a criminal history category of III instead of II was appropriate. This resulted in a Guideline imprisonment range of 27 to 33 months. To reflect the seriousness of petitioner's conduct and to protect the public, I imposed a sentence at the top of the range—33 months. I specifically recommended to the Bureau of Prisons that "Defendant should receive psychiatric treatment while in prison. *See* report of Compulsive Gambling Center, Inc. dated September 1, 1994."

Petitioner was advised of his right to appeal from the sentence. He did not do so.

On March 23, 1995, petitioner filed his petition pursuant to 28 U.S.C. § 2255 asserting ineffective assistance of counsel at the time of sentencing. Specifically, the bases for the claim are:

(a) failure to present expert testimony in order to pursue a downward departure from the sentencing guidelines based on a theory of *diminished capacity* pursuant to § 5K2.13;

(b) failure to object to the pre-sentencing report and the rulings of the Court increasing the Defendant's criminal history range from Category II to Category III and the ultimate sentencing of the Defendant of [sic] the top end of the sentencing guidelines, without consideration of any departure issues relating to whether Defendant's diminished capacity was operating at the time he committed his prior offenses;

(c) failure to present expert testimony and other evidence necessary to pursue a "combined departure" under 18 U.S.C. § 3553(b);

The government has responded to the petition.

## II. *Discussion*

█ A § 2255 petitioner bears the burden of proof to support a claim of ineffective assistance of counsel. *United States ex rel v. Johnson,* 531 F.2d 169, 174 (3d Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a two-prong test for determining whether counsel's performance was so defective that a reversal of the defendant's conviction is required.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. *See Lewis v. Mazurkiewicz,* 915 F.2d 106, 110 (3d Cir. 1990); *United States v. Gray,* 878 F.2d 702, 710 (3d Cir.1989). The *Strickland* court further explained that the proper measure for evaluating the performance of counsel is "reasonableness under prevailing professional norms." 466 U.S. at 688, 104 S.Ct. at 2065. A defendant making a claim of ineffective assistance of counsel must "identify acts or omissions of counsel that are alleged not to have been the result of professional judgement." *Id.* at 690, 104 S.Ct. at 2066. In addition, the court held that a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. He must "affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. at 2067. Hence, even if counsel's conduct was unreasonable, it "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691, 104 S.Ct. at 2066. Finally, the court warned that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689, 104 S.Ct. at 2065.

█ Certain elements of the grounds which petitioner advances to support his ineffective assistance of counsel claim are patent-

ly without merit. Petitioner faults sentencing counsel's "failure to present expert testimony." There obviously was no need for expert testimony. Everything an expert could have testified about was contained in the comprehensive psychiatric report which petitioner's attorney arranged for and presented to the Court. The facts and opinions set forth in the report were not challenged by the government, and I relied upon them when fashioning the sentence. The legal effect of these facts and opinions were, of course, for me to determine.

■ Next, petitioner faults defense counsel's "failure to object to the pre-sentencing report and the rulings of the Court increasing the Defendant's criminal history range from Category II to Category III and the ultimate sentencing of Defendant [at] the top end of the sentencing guidelines." Counsel did not object to the pre-sentence report because it was as favorable to his cause as it could be under the circumstances. He objected most strenuously to my departing upward by increasing the criminal history category from II as found in the PSR to III as sought by the government. Defense counsel argued for leniency within the sentencing range set forth in the PSR (24 to 30 months) which was an unmistakable argument for leniency within the range which I applied by means of upward departure (27 to 33 months). It was no fault of counsel that I rejected his argument against upward departure and against leniency.

The heart of petitioner's § 2255 argument is that his counsel at the time of sentencing did not move for a downward departure on the ground of diminished capacity, U.S.S.G. § 5K2.13. This section provides:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

■ In view of petitioner's gambling propensities and the possibility that these propensities were compulsive in nature, petitioner's counsel acted responsibly and prudently when he obtained a detailed psychiatric report. It must be emphasized, however, that the least likely use of such a report is support for a § 5K2.13 downward departure. The more likely uses of psychiatric reports include enabling a sentencing judge to recommend appropriate treatment while a defendant serves a prison term and guiding a sentencing judge as he fashions conditions of supervised release. *See* O'Connell, Debevoise and Napurano, *Further Observations on Federal Sentencing Guidelines*, 16 Am. Jour. of Forensic Psychiatry No. 2 (1995).

In the present case, it is apparent that petitioner's compulsive gambling and so-called "post traumatic stress disorder" are not a basis for a § 5K2.13 downward departure. Therefore, petitioner's counsel did not engage in unreasonable behavior in the light of prevailing professional norms when he failed to bring a meritless motion. Further, petitioner suffered no prejudice because such a motion would surely have been denied.

As a matter of law, a downward departure is not warranted under U.S.S.G. § 5K2.13 unless the defendant seeking it has committed a non-violent offense and further establishes, by a preponderance of the evidence, that:

(1) he committed the offense while suffering from a significantly reduced mental capacity;

(2) his reduced mental capacity was not caused by the voluntary use of intoxicants;

(3) there was a direct causal connection between such mental capacity and defendant's commission of the offense; and

(4) defendant's criminal history does not indicate that incarceration is necessary to protect the public.

By no stretch of the imagination can petitioner be said to have met criteria 1 and 3, and I would conclude that, as a matter of general deterrence, protection of the public required that he serve a significant prison term.

The purposes of treatment and the purposes of applying § 5K2.13 are different.

For treatment and clinical purposes, pathological gambling is identified in the *Statistical Manual of Mental Disorders*, Fourth Edition ("DSM–IV") as one of several "impulse control" disorders. *United States v. Harris*, 1994 WL 683429 (Dec. 6, 1994, S.D.N.Y.) (unpublished); *see* Exhibit "B" to petitioner's § 2255 motion. However, such inclusion does not suggest that gambling is a basis for a downward departure.

Specifically, the purpose of DSM–IV is to facilitate treatment. *Id.* at pages 3, 13. DSM–IV simply does not address the issue of what does, or should, constitute significantly reduced mental capacity within the meaning of the Sentencing Guidelines. In fact, users of DSM–IV are explicitly warned, in a "Cautionary Statement," that:

> inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder or mental disability. The clinical and scientific considerations involved in the categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination and competency.

*Id.* at page 13 (quoting DSM–IV, pg. xxxvii).

The limited clinical purpose of DSM–IV stands in marked contrast to the broad requirements of U.S.S.G. § 5K2.13, which deals with questions of criminal culpability. For instance, while DSM–IV does not purport to make "disability determinations," U.S.S.G. § 5K2.13 mandates that very analysis.

Indeed, this analysis is imbedded in the "significantly reduced mental capacity" component of the Guideline, which "connotes an impairment of the intellect, a failure to be able to quickly or fully grasp ordinary concepts" that results in distorted reasoning and interference with a defendant's ability to make considered decisions. *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir.1993). Otherwise stated, a defendant able to "absorb information in the usual way and to exercise the power of reason" is not suffering from a significantly reduced mental capacity under U.S.S.G. § 5K2.13. *United States v. Hamilton*, 949 F.2d 190, 193 (6th Cir.1991) (affirming district court's denial of defendant's downward departure motion on the basis of compulsive gambling). *See United States v. Johnson*, 979 F.2d 396, 400 (6th Cir.1992) (same result, regarding defendant's Severe Adjustment Disorder).

It is, therefore, apparent that downward departures under this Guideline section are rarely given absent extreme circumstances not present here. *Compare, Cantu*, 12 F.3d at 1513 (departure amply supported by defendant's Post Traumatic Stress Disorder, which resulted in nightmares, combat flashbacks, intrusive thoughts and images, anxiety, depression, rage, explosiveness, marked paranoia and extensive hospitalization); *United States v. McMurray*, 833 F.Supp. 1454 (D.Neb.1993), *affirmed,* 34 F.3d 1405 (8th Cir.1994) (downward departure warranted for defendant suffering from bipolar disorder characterized by manic episodes, marked impairment of functioning and, on occasion, involuntary hospitalization) *and United States v. Adonis*, 744 F.Supp. 336 (D.C.C.1990) (mentally retarded defendant with IQ in lowest one percentile of the population met the requirements of U.S.S.G. § 5K2.13) *with United States v. Johnson*, 979 F.2d 396, 400 (6th Cir.1992) (downward departure unavailable where there was "no indication that [the defendant] was unable to process information or to reason").

In particular, Dr. Lorenz's diagnosis covered all three of Venezia's mental disorders. She made her diagnosis while acting on Venezia's behalf to reduce Venezia's sentence. Dr. Lorenz, nevertheless, concluded that his gambling disorder was "in remission." She also concluded that Venezia was an alert, fully oriented, quick-minded and intelligent person who was neither paranoid nor depressed "and knew right from wrong." Simply stated, Dr. Lorenz's own diagnosis, standing alone, makes clear that Venezia was able to "absorb information in the usual way and to exercise the power of reason."

The PSR describes in great detail the continuing, complex scheme which petitioner carried out while defrauding GSA and First

Southern. No one with the kind of diminished capacity contemplated by § 5K2.13 could have carried out such a sophisticated operation during the course of several years. During the same period, petitioner engaged in other activities such as the purchase of a $100,000 yacht, and he was able to stop gambling on his own accord for substantial periods.

Not only did petitioner not suffer diminished capacity, there was no direct causal connection between his compulsive gambling and the on-going fraudulent scheme. It is true that his gambling losses resulted in large debts, and that his indebtedness provided additional motivation to continue and expand his fraudulent operations. A more compelling motive to defraud is not the kind of direct causation between mental capacity and commission of the offense envisioned by § 5K2.13.

### III. *Conclusion*

Thus, there was no basis for a § 5K2.13 downward departure motion, and had such a motion been made, it would have been denied. Petitioner, therefore, has not established either that his sentencing attorney's performance was deficient nor that he was prejudiced by the attorney's failure to file a § 5K2.13 downward departure motion. The petition will be dismissed. I shall file an appropriate order.