**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1282
_____

RAVIDATH RAGBIR,
                            Appellant

v.

UNITED STATES OF AMERICA
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 2-17-cv-01256
District Judge: The Honorable Kevin McNulty

Argued October 30, 2019

Before: SMITH, *Chief Judge*, HARDIMAN, and PHIPPS,
*Circuit Judges*

(Filed: February 10, 2020)


Alina Das
Amy Joseph                           **[ARGUED]**
Jessica Rofe
Daniela Ugaz                         **[ARGUED]**
Washington Square Legal Services, Inc.
Immigrant Rights Clinic
245 Sullivan Street
5th Floor
New York, NY  10012

R. Scott Thompson
Wollmuth Maher & Deutsch

500 Fifth Avenue
12th Floor
New York, NY 10110
    *Counsel for Appellant*

Mark E. Coyne                    **[ARGUED]**
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
    *Counsel for Appellee*

Lawrence S. Lustberg
Gibbons
One Gateway Center
Newark, NJ 07102
    *Counsel for Amici Immigrant Defense Project and*
    *National Immigration Project of the National Lawyers*
    *Guild in Support of Appellant*

————————————

OPINION

————————————


SMITH, *Chief Judge.*

Ravidath Ragbir, a green card holder from Trinidad and Tobago, was convicted of mortgage fraud in 2000. Because the loss attributable to the fraud exceeds $10,000, the Department of Homeland Security seeks to remove Ragbir to his native country. To avoid the immigration consequences collateral to his conviction, Ragbir filed a petition for a writ of error coram nobis, seeking either a new trial or resentencing. Because Ragbir fails to meet the requirements for issuance of the writ, we will affirm the District Court's denial of the petition.

**I**

## A. District of New Jersey Felony Conviction

Ragbir came to the United States as a lawful permanent resident in 1994, and by the late 1990s, he worked in sales at Household Finance Corporation ("HFC"). At HFC, Ragbir was responsible for soliciting mortgage applications, conducting initial reviews, and referring appropriate applications to the company's underwriter. A real estate broker going by the name of Robert Taylor—whose actual name was Robert Kosch—recruited individuals to submit fraudulent mortgage applications, which Ragbir preliminarily approved. After HFC had disbursed large sums of money, company investigators and the police began questioning various employees, including Ragbir, about the fraudulent applications.

Ragbir and four others were eventually indicted on six counts of wire fraud and one count of conspiracy to commit wire fraud under 18 U.S.C. §§ 371, 1343. The indictment alleged that Ragbir accepted and preliminarily approved fraudulent applications from individuals that Kosch hired to pose as loan applicants. Attorney Patricia Lee represented Ragbir in the criminal proceedings, and before trial, he raised with her his concerns about the immigration consequences of a conviction. Attorney Lee advised Ragbir that a conviction *could* result in deportation, but Ragbir mistakenly gathered that a conviction alone *would* make him deportable.

At his November 2000 trial, the government presented Ragbir's confession to the police. Although defense counsel challenged the accuracy of the transcribed confession, the jury found Ragbir guilty on all counts. The jury was not required, however, to make a loss determination, so that issue was addressed at sentencing. Defense counsel and the government vigorously disputed the dollar figure, but the two sides eventually reached an agreement that the actual loss was between $350,000 and $500,000.[1] Attorney Lee counseled

---

[1] The government's initial loss calculation was over $1 million, which Attorney Lee challenged in various ways: she objected to the draft presentence report; looked for analysis of title searches, appraisals, deeds, defects in title, and whether HFC could recover the properties; attempted to persuade the government that the loss calculation should exclude bargained-

Ragbir to waive his right to a hearing at which the prosecution and the defense could present evidence about what sentence is appropriate and to stipulate to the agreed-upon range. Ragbir agreed to the stipulation, believing that his convictions alone made him deportable; the amount of loss, in his view, was irrelevant.[2] The District Court adopted the stipulation, sentencing Ragbir to thirty months' imprisonment, three years' supervised release, and $350,001 in restitution.

Ragbir appealed, and the service of his sentence was delayed pending the appeal. Ragbir's appellate counsel, Anthony Fusco, asserted a variety of claims—among them, that Ragbir's confession was involuntary and the evidence at trial was insufficient to find Ragbir guilty. This Court affirmed Ragbir's convictions and sentence, *United States v. Ragbir*, 38

for interest; and opposed HFC's efforts to increase the loss amount by including investigation fees and costs of potential foreclosures. After several months of negotiations, the parties agreed that only HFC's actual loss—the shortfall after accounting for payments and collateral—could count for purposes of sentencing.

Of the eighteen transactions involved in this case, Ragbir asserts that only eight loans, five indicted and three unindicted, can be properly attributed to him. HFC had disbursed $557,697.31 on these eight loans. But it may have had no enforceable security interest in certain properties pledged as collateral. For example, the nominal borrowers for three of the fraudulent disbursements never authorized the loans taken out in their names. HFC disbursed approximately $290,000 for these three loans, and the record shows that it recovered only $7,250. Moreover, one loan was based on a forged deed, so HFC could not foreclose on the mortgaged property to recover its $103,000 expenditure.

Despite defense counsel's efforts, the government sought a dollar loss exceeding $800,000. It took considerable negotiation before the government agreed to a stipulation of around $350,000, and the trial court stated that there was no doubt the loss could exceed that amount. Looking solely at the five indicted loans, the District Court concluded that the actual loss was $426,048.03.

[2] A crime of fraud or deceit causing a loss exceeding $10,000 may qualify as an aggravated felony, triggering potential immigration consequences. 8 U.S.C. § 1101(a)(43)(M)(i).

F. App'x 788 (3d Cir. 2002), and the United States Supreme Court denied certiorari. *Ragbir v. United States*, 537 U.S. 1089 (2002). Ragbir never sought relief under § 2255.

Ragbir began serving his sentence in February 2004. While imprisoned, he consulted with a lawyer about seeking post-conviction relief but was told that nothing could be done. Ragbir's supervised release began in May 2006 and concluded on May 22, 2009.

## B.    *Immigration Related Proceedings*

Upon completion of his prison sentence in May 2006, Ragbir was placed in immigration custody while the Department of Homeland Security ("DHS") commenced removal proceedings. It was during those proceedings that Ragbir learned that his stipulation to a loss of more than $10,000, rather than his convictions themselves, was what made him deportable. Ragbir's immigration counsel, David Kim, recognized the significance of the loss stipulation and represented to the Immigration Judge ("IJ") that a criminal defense attorney would be hired to attempt to vacate the underlying convictions. Despite this representation, Ragbir did not pursue a collateral attack. On August 7, 2006, the IJ held that Ragbir's convictions constituted aggravated felonies and ordered him removed from the United States.

On review, the Board of Immigration Appeals ("BIA") affirmed the IJ's order. Ragbir sought review of the decision, and in February 2008, DHS placed Ragbir on supervised release pending resolution of his petition. The Second Circuit upheld the BIA's decision in 2010, *Ragbir v. Holder*, 389 F. App'x 80 (2d Cir. 2010), and the Supreme Court denied certiorari. *Ragbir v. Holder*, 565 U.S. 816 (2011).

Later that year, Ragbir married an American citizen. Together, they applied for an immigrant visa based on their marriage and received approval in November 2011. The following month, DHS granted Ragbir a stay of removal. Ragbir filed a motion to reopen the proceedings before the BIA based on his having an immigrant visa and the Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358 (2010) (narrowing honest services fraud). On May 15, 2012, the BIA denied the motion, stating that the issues surrounding Ragbir's conviction were properly the subject of the federal

5

courts. Ragbir filed a petition for review which was unsuccessful. *Ragbir v. Lynch*, 640 F. App'x 105 (2d Cir. 2016).

DHS eventually elected not to renew its discretionary stay of removal, and on January 11, 2018, Ragbir was taken into immigration custody. Ragbir then challenged his detention under 28 U.S.C. § 2241 in the United States District Court for the Southern District of New York, which granted his habeas petition and ordered him released. *Ragbir v. Sessions*, No. 18-cv-236, 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018). On March 23, 2018, the United States District Court for the District of New Jersey entered a stay of removal. The Second Circuit likewise stayed removal. *See Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019).

## C. Coram Nobis Proceedings

After the BIA denied Ragbir's motion to reopen the proceedings in May 2012, he filed a petition seeking a writ of error coram nobis in the United States District Court for the District of New Jersey on November 30, 2012. In that petition, Ragbir asserted that his conviction should be overturned because jury instructions given at his trial were erroneous in light of later Supreme Court rulings—*Skilling* (2010) (narrowing honest-services fraud) and *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) (clarifying willful blindness). He also claimed ineffective assistance of counsel based on Attorney Lee's (1) failure to explain that the loss attributed to his conviction would have immigration consequences and (2) advice to forego a sentencing hearing. Ragbir and the government decided to work toward an amicable settlement. Aware of these efforts, the District Court administratively terminated the matter without prejudice on May 30, 2013.

The parties' negotiations failed. That led Ragbir to file an amended coram nobis petition in February 2015. This amended petition included three new allegations: trial counsel was ineffective because she failed to (1) sufficiently investigate and negotiate the loss amount and (2) retain a linguistics expert to challenge the authenticity of Ragbir's confession, and appellate counsel was ineffective because he (3) failed to assert that the willful blindness jury instruction

6

was erroneous. Based on further discussions, the parties submitted a joint stipulation to voluntarily dismiss the action without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) to allow Ragbir to pursue a presidential pardon. The District Court granted the agreed-upon relief on March 3, 2016.

Like the settlement talks, Ragbir's attempt to secure a pardon was unsuccessful. He renewed his coram nobis petition on February 22, 2017. After briefing concluded, the District Court held an evidentiary hearing on May 4, 2018 and denied coram nobis on January 25, 2019. Five days later, Ragbir filed this appeal. Ragbir asked the District Court to stay the IJ's removal order pending the disposition of this appeal. The District Court denied the request, but it extended an earlier stay, thereby allowing Ragbir to make an emergency application to this Court. We denied the emergency stay application because Ragbir failed to show that he was likely to succeed on the merits. Nonetheless, the Second Circuit stay remains in effect. *See Ragbir v. Homan*, 923 F.3d 53.

On appeal, Ragbir asserts that the District Court erred in denying his petition for a writ of error coram nobis. He claims, inter alia, (1) ineffective assistance of trial counsel due to affirmative misadvice on the immigration consequences of stipulating to a deportable loss amount; (2) ineffective assistance of trial counsel for failure to investigate, negotiate, and properly calculate the attributable loss; (3) ineffective assistance of trial counsel for not introducing expert testimony; (4) an erroneous willful blindness jury instruction permitted the finder of fact to convict Ragbir of non-criminal conduct; and (5) the "scheme or artifice to defraud" jury instruction, which Ragbir characterizes as "dishonesty type language," was unconstitutionally vague, allowing the jury to inappropriately convict him based on lawful activity.

## II

This Court has jurisdiction to review the District Court's denial of coram nobis pursuant to 28 U.S.C. § 1291. Based on the standards articulated in *United States v. Orocio*, legal questions receive de novo review while clear error review applies to factual findings. 645 F.3d 630, 635 (3d Cir. 2011), *abrogated on other grounds by Chaidez v. United States*, 568 U.S. 342 (2013).

## III

7

At common law, appeals were not always a matter of right.[3] A factual error that was unknown at the time of trial and that would have resulted in a different outcome did not give rise to a remedy until the mid-sixteenth century.[4] By then,[5] the judiciary had fashioned the writs of *quae coram nobis resident* ("let the record remain before us") and *quae coram vobis resident* ("let the record remain before you"),[6] which were intended to correct the occasional injustice stemming from factual errors in the Court of King's Bench and the Court of Common Pleas, respectively.[7]

Coram nobis was seldom used, despite its availability in both civil and criminal cases.[8] Such rare invocation of the writ resulted, in part, from the requirement that the challenged judgment be erroneous in fact and not in law.[9] Moreover, only

---

[3] ELI FRANK, CORAM NOBIS: COMMON LAW, FEDERAL, STATUTORY, WITH FORMS 1 (1953).

[4] Stanley H. Fuld, *The Writ of Error Coram Nobis*, 117 N.Y. L.J., June 5, 1947, at 2212.

[5] Just how coram nobis came to be is unclear. *See id.* (noting a 1553 reference in FitzHerbert's *Natura Brevium*).

[6] "The writs of error *coram nobis* and error *coram vobis* differed from ordinary common law writs of error. An ordinary writ of error removed a judgment from an inferior court to a superior one for review and correction of errors of law or fact. *Coram nobis* and *coram vobis*, in contrast, directed the court that rendered the judgment to correct its own error." Brendan W. Randall, *United States v. Cooper: The Writ of Error Coram Nobis and the Morgan Footnote Paradox*, 74 MINN. L. REV. 1063, 1066 n.20 (1990); *see also* W.W. Thorton, *Coram Nobis Et Coram Vobis*, 5 IND. L.J. 603, 605 (1930).

[7] "The English common law distinction between *coram nobis* and *coram vobis* reflects the procedural nature of the English judicial system as opposed to the substantive nature of the writs. Most American courts have shown little concern for this technical distinction and have used the terms interchangeably." Randall, *supra* note 6, at 1067 n.22; *see also* Abraham L. Freedman, *The Writ of Error Coram Nobis*, 3 TEMP. L. Q. 365, 367-68 (1929). Freedman was a member of this Court from 1964 through 1971.

[8] *See* Freedman, *supra* note 7, at 374; Randall, *supra* note 6, at 1066.

[9] FRANK, *supra* note 3, at 3.

"certain facts which affect[ed] the validity and regularity of the legal decision itself" justified issuance of the writ.[10] By the nineteenth century, the writ of error coram nobis "was hoary with age and even obsolete."[11] Blackstone makes no mention of it in his *Commentaries*,[12] and Holdsworth devotes approximately five lines to the subject.[13] American courts, however, breathed new life into this "hoary" writ.

Coram nobis migrated to the United States with the common law, but it developed a more expansive reach than in England.[14] Although the writ was still available for correcting factual errors that lie outside the record—in both federal and state courts as well as both civil and criminal matters—many courts imported new grounds from equity.[15] Still, the writ's utility diminished over time. Other remedies, such as a motion for a new trial or habeas corpus, supplanted it.[16] Some states abandoned coram nobis altogether through statutory schemes

---

[10] Freedman, *supra* note 7, at 367. Examples include coverture and the death of a party before judgment. *See id.* at 390-92.

[11] *Anderson v. Buchanan*, 168 S.W.2d 48, 55 (Ky. 1943).

[12] *See* 3 WILLIAM BLACKSTONE, COMMENTARIES *406 (Thomas M. Cooley ed., 3rd ed. 1884); *see also Pickett's Heirs v. Legerwood*, 32 U.S. 144, 147 (1833); Fuld, *supra* note 4; Morgan Prickett, *The Writ of Error Coram Nobis in California*, 30 SANTA CLARA L. REV. 1, 6 n.18 (1990).

[13] *See* 1 WILLIAM SEARLE HOLDSWORTH, A HISTORY OF ENGLISH LAW 224 (3d ed. 1922).

[14] *See* Daniel F. Piar, *Using Coram Nobis to Attack Wrongful Convictions: A New Look at an Ancient Writ*, 30 N. KY. L. REV. 505, 507 (2003).

[15] *See, e.g.*, *Sanders v. State*, 85 Ind. 318 (1882); *see also* Fuld, *supra* note 4; Piar, *supra* note 14.

[16] *See* Piar, *supra* note 14, at 508-09.

9

for post-conviction litigation,[17] and the Federal Rules of Civil Procedure expressly abolished it in 1948.[18]

As the scope of coram nobis narrowed, some began to question its continued applicability to criminal convictions in federal courts. The Supreme Court reserved judgment on the issue,[19] and over time, the courts of appeals became divided.[20] The 1946 promulgation of Rule 35 of the Federal Rules of Criminal Procedure, allowing a district court to correct an illegal sentence at any time, and the enactment of 28 U.S.C. § 2255 in 1948 further undermined the usefulness of coram nobis.[21]

The writ of error coram nobis was moribund—at least in the federal courts—until the Supreme Court revived and refashioned it in 1954. *See United States v. Morgan*, 346 U.S. 502 (1954). In *Morgan*, the Court held that (1) Rule 60(b) did not abolish coram nobis in criminal contexts, (2) Rule 35 did not render the writ unnecessary, and (3) section 2255 did not replace coram nobis. *Id.* at 505 n.4, 505-06, 510-11. Instead, the Supreme Court stated that the continuing vitality of coram nobis was grounded in the All Writs Act of 1789. *Id.* at 506. The Court also broadened the scope of coram nobis relief beyond that of curing factual errors: the writ's function was to correct errors of the most "fundamental character." *Id.* at 511-12. Coram nobis became a collateral remedy to correct fundamental errors, whether factual or legal.[22]

Although the modern contours of coram nobis are broader than at common law, the writ is still limited to

---

[17] *See, e.g.*, *Dewey v. Smith*, 230 N.W. 180, 180-81 (Mich. 1930) (*coram vobis* had become obsolete due to statutory methods of correcting errors); *Boyd v. Smyth*, 205 N.W. 522, 523-24 (Iowa 1925) (coram nobis was abolished when omitted in revised statute); *State v. Hayslip*, 107 N.E. 335 (Ohio 1914) (finding that common law writs and pleas are defined by statute).

[18] Fed. R. Civ. P. 60(b) (1946) (effective Mar. 19, 1948).

[19] *See United States v. Mayer*, 235 U.S. 55, 69 (1914).

[20] *See* Randall, *supra* note 6, at 1067 n.26.

[21] *See id.* at 1067-68.

[22] David Wolitz, *The Stigma of Conviction: Coram Nobis, Civil Disabilities, and the Right to Clear One's Name*, 2009 BYU L. REV. 1277, 1286-87 (2009).

"'extraordinary' cases presenting circumstances compelling its use 'to achieve justice.'" *United States v. Denedo*, 556 U.S. 904, 910-11 (2009) (quoting *Morgan*, 346 U.S. at 510). Coram nobis may not issue if alternative remedies, such as habeas corpus, are available. *Denedo*, 556 U.S. at 911; *United States v. Rhines*, 640 F.3d 69, 71 (3d Cir. 2011). 28 U.S.C. § 2255 provides a means to vacate, set aside, or correct a conviction, yet it does not apply if a defendant is no longer in custody. As a residual and interstitial remedy, coram nobis can fill that gap. It provides a means to challenge a federal conviction where a party who is no longer in custody for purposes of § 2255 faces continuing consequences as a result of being convicted. *Rhines*, 640 F.3d at 71; *United States v. Baptiste*, 223 F.3d 188, 189 (3d Cir. 2000); *Chaidez*, 568 U.S. at 345 n.1; *United States v. Stoneman*, 870 F.2d 102, 105-06 (3d Cir. 1989).

"[T]he standard for obtaining [coram nobis] is more stringent than that applicable on direct appeal or in habeas corpus" in recognition of judicial interests in finality and efficiency. *Rhines*, 640 F.3d at 71; *Stoneman*, 870 F.2d at 106. Accordingly, coram nobis relief is limited and seeks out error of the most fundamental character—the kind that renders the proceeding itself irregular and invalid. *Mayer*, 235 U.S. at 69; *see also Morgan*, 346 U.S. at 511 ("[R]eview should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice."); *Stoneman*, 870 F.2d at 106 ("The error must go to the jurisdiction of the trial court, thus rendering the trial itself invalid."). "An error which could be remedied by a new trial, such as an error in jury instructions, does not normally come within the writ," *Stoneman*, 870 F.2d at 106 (citing *Mayer*, 235 U.S. at 69 and *United States v. Gross*, 614 F.2d 365, 368 (3d Cir. 1980)), and it is presumed that the prior proceedings were properly conducted. The petitioner has the burden to show otherwise. *Morgan*, 346 U.S. at 512; *United States v. Cariola*, 323 F.2d 180, 184 (3d Cir. 1963). This means that "it is difficult to conceive of a situation in a federal criminal case today where [a writ of *coram nobis*] would be necessary or appropriate." *Carlisle v. United States*, 517 U.S. 416, 429 (1996) (alteration in original) (internal quotation marks and citations omitted).

A distillation of our caselaw establishes five prerequisites for coram nobis relief: the petitioner (1) is no

longer in custody; (2) suffers continuing consequences from the purportedly invalid conviction; (3) provides sound reasons for failing to seek relief earlier; (4) had no available remedy at the time of trial; and (5) asserted error(s) of a fundamental kind. *See Mendoza v. United States*, 690 F.3d 157, 159 (3d Cir. 2012); *Orocio*, 645 F.3d at 634 n.4; *Rhines*, 640 F.3d at 71; *Stoneman*, 870 F.2d at 105-06. The government concedes that the first two conditions are satisfied. The last three requirements are, however, in dispute.

## A. *Sound Reasons for Delay*

Coram nobis reflects the tension that so often exists between finality and equity. While the writ has no rigid time limit, our caselaw emphasizes that "[the] 'sound reason' standard is even stricter than that used to evaluate § 2255 petitions" because habeas is generally the exclusive means to collaterally challenge a federal conviction or sentence.[23] *See Mendoza*, 690 F.3d at 159.

A defendant seeking to avoid the collateral consequences of a conviction cannot postpone seeking relief until it appears that a collateral consequence is imminent. Still, coram nobis is a "remedy of last resort." *Fleming v. United States*, 146 F.3d 88, 89-90 (2d Cir. 1998). Consistent with these principles, a petitioner is not required to "challenge his conviction at the earliest opportunity"; the writ "only requires [a petitioner] to have sound reasons for not doing so." *United States v. Kwan*, 407 F.3d 1005, 1014 (9th Cir. 2005).

Yet the more time that elapses between a party's conviction and his petition for coram nobis, the less likely it becomes that sound reasons exist. We have previously found delays of less than five years untimely. *See, e.g.*, *Mendoza*, 690 F.3d at 159-60 (four-year delay in bringing ineffective assistance of counsel claim was unjustified, even though immigration law was unsettled). Legal ambiguity is also not a sound reason for delay. *Id.* at 160. It may be that the diligent pursuit of administrative remedies qualifies as a sound reason, but we have yet to address that question. *See Kwan*, 407 F.3d at 1013-14; *Kovacs v. United States*, 744 F.3d 44, 54 (2d Cir.

---

[23] We do not address whether the failure to pursue § 2255 relief constitutes a procedural default barring coram nobis relief.

2014). Given the nature of coram nobis, we must adapt the principle of timeliness to the facts before us.

## B. *No Available Remedy at the Time of Trial*

We have not previously elaborated on the requirement that there was no available remedy at the time of trial, but we can say that it focuses on whether a party was unable to make certain arguments at trial or on direct appeal. *See Mendoza*, 690 F.3d at 159; *Stoneman*, 870 F.2d at 106.

## C. *Fundamental Error*

The fifth prerequisite is two-pronged: there must be an error, and the error must be fundamental. The identification and assertion of "error" is *sine qua non* of all appellate adjudication, but "fundamental error," within the context of coram nobis, is unique. The term "fundamental" refers to "defect[s] which inherently result[] in a complete miscarriage of justice."[24] *United States v. Woods*, 986 F.2d 669, 676 (3d Cir. 1993) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)). Errors that can be remedied through a new trial do not usually fall within the writ. *Rhines*, 640 F.3d at 71. Instead, the defects must completely undermine the jurisdiction of the court, rendering the trial itself invalid. *Id*. Coram nobis is therefore generally inappropriate when an alternative remedy is available. *Id*.

Because a new trial can correct faulty jury instructions, such errors will not typically qualify as fundamental. *Id*. However, instructions that result in a conviction on a charge based on activity that is lawful are fundamentally erroneous. *See Stoneman*, 870 F.2d at 105, 107-08; *United States v. McClelland*, 941 F.2d 999, 1002-03 (9th Cir. 1991); *United States v. Mandel*, 862 F.2d 1067, 1075 (4th Cir. 1988). *Stoneman*, a case where the jury heard both correct and incorrect instructions, held that "[a]n error in the jury instructions—when a valid conviction could have been had under different instructions . . .—is not the sort of fundamental defect that produces a complete miscarriage of justice." 870 F.2d at 108 (alteration in original) (quoting *United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988)). Ineffective assistance of counsel, by contrast, is normally considered

---

[24] As coram nobis affords an additional layer of review, the standard for relief may be higher than for other remedies.

"fundamental." *See United States v. Rad–O–Lite of Phila., Inc.*, 612 F.2d 740, 744 (3d Cir. 1979) (The writ is available to "persons not held in custody [to] attack a conviction for fundamental defects, such as ineffective assistance of counsel.").

## IV

On appeal, Ragbir offers numerous reasons why he waited nearly ten years[25] before seeking a writ of coram nobis:[26] while incarcerated, a criminal defense attorney told him that nothing could be done to challenge his conviction; he did not discover his trial attorney's purported errors until 2006; after being taken into immigration custody, he focused on challenging his removal rather than his conviction; he was exhausting his administrative remedies; his jury instruction arguments were unavailable until after 2010's *Skilling* decision and 2011's *Global-Tech* ruling; his ineffective assistance of counsel claims were not ripe until after *Padilla v. Kentucky* in 2010 and *Lafler v. Cooper* and *Missouri v. Frye* in 2012; and he promptly filed a coram nobis petition after being informed that challenges to his criminal conviction could not be heard administratively. None of these reasons excuse Ragbir's delay.

First, this Court does not apply a timeliness standard for coram nobis that is forgiving of delay and dilatoriness. *See Mendoza*, 690 F.3d at 159. Though Ragbir claims he was unaware of the immigration consequences of his sentencing stipulation until 2006, from that time forward he knew that the underlying conviction needed to be challenged. Yet he waited another six years before taking any action to collaterally challenge his conviction. During those six years, Ragbir chose to pursue administrative remedies rather than coram nobis relief. He offers no acceptable explanation for why he did not seek both forms of relief concurrently. Furthermore, Ragbir's pursuit of administrative remedies cannot constitute a sound reason for delay since the immigration relief he seeks is

---

[25] Ten years passed from direct appeal in 2002 until his first coram nobis petition in 2012.

[26] The government's timeliness argument does not rely on the five years (2012–17) that elapsed between Ragbir's first coram nobis petition and the current iteration.

dependent upon a successful collateral challenge to his underlying conviction.[27]

Second, Ragbir mistakenly believes that his jury instruction arguments were unavailable until 2010 and 2011.[28] He admits that, at the time of his trial, caselaw already existed addressing willful blindness and "dishonesty type language." He claims, however, that our precedent was ambiguous before *Skilling* and *Global-Tech*. That claim is unavailing: we have rejected the

---

[27] Ragbir asked the BIA to assess the validity of his conviction, but it refused, stating that the issues surrounding his conviction needed to be raised in the federal courts. *In re Ravidath Lawrence Ragbir*, No. A044 248 862 (B.I.A. May 15, 2012).

[28] As to appellate counsel's failure to raise willful blindness on appeal, Ragbir's opening brief addresses the issue in a single footnote. Footnote seven states in its entirety:

> In 2002, appellate counsel failed to object to the improper willful blindness jury instruction, despite trial counsel's preservation of this claim, and despite Mr. Ragbir's insistence that his attorney look into the issue of the jury instructions. JA125 ¶ 10; JA345.

We have previously considered one-sentence footnotes insufficient to preserve an issue on appeal. *See, e.g.*, *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 95 n.5 (3d Cir. 2012) ("[Petitioner] only references this colloquy in a footnote in his opening brief, and therefore has failed even to adequately raise the issue before us."); *United States v. DeMichael*, 461 F.3d 414, 417 (3d Cir. 2006) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (citation omitted)).

Footnote seven also references two parts of the joint appendix. J.A. 125 ¶ 10 includes a statement from Ragbir's coram nobis affidavit asserting that appellate counsel failed to litigate the issue of willful blindness without providing an explanation for this failure. J.A. 345 is a copy of Ragbir's direct appeal brief, containing no arguments addressing willful blindness. Absent from footnote seven is any assertion of ineffective assistance of appellate counsel. Any ineffectiveness claim regarding appellate counsel is therefore waived.

15

notion that ambiguity in the law justifies "a delay in filing a coram nobis petition."[29]  *Mendoza*, 690 F.3d at 160.  What matters is whether a claim can be reasonably raised.

---

[29] Even if legal ambiguity constituted a sound reason for delay, we do not perceive any opacity in our caselaw.  Ragbir argues that our caselaw prevented him from addressing willful blindness at trial or on appeal because (1) *Global-Tech* was not decided until 2011 and (2) this Circuit did not previously recognize the distinction between subjective and objective knowledge that *Global-Tech* articulates.  We disagree.

*Global-Tech* did not promulgate a new test; rather, it stated already settled law.  563 U.S. at 769 n.9 (citing *United States v. Stadtmauer*, 620 F.3d 238, 257 (3d Cir. 2010)).  Although *Stadtmauer* was decided ten years after Ragbir's trial, it cites two examples of Third Circuit precedent accurately describing the "subjective awareness" element of willful blindness before Ragbir's direct appeal.  *See, e.g.*, *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000); *United States v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985) (indicating that a willful blindness charge must "make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability").

The "deliberate avoidance" prong was also clear law within this Circuit by 1995.  *See United States v. Hayden*, 64 F.3d 126, 133 & n.11 (3d Cir. 1995) (finding that knowledge can be imputed where a defendant deliberately avoided learning a fact but not where a defendant was "merely negligent or reckless in failing to realize the unlawfulness of his actions"); *see also Wert-Ruiz*, 228 F.3d at 255.  We perceive no ambiguity in our caselaw.  Yet even if a lack of clarity existed, Ragbir could have reasonably argued at trial or on appeal that the willful blindness instruction was erroneous.

Ragbir also asserts that he was unable to bring his scheme or artifice to defraud claim prior to 2010's *Skilling* decision, which narrowed honest-services fraud.  However, *Skilling* is inapposite because Ragbir was not convicted under an honest-services fraud theory.  And even if he had been, *Skilling* would not be determinative.  Ragbir acknowledges that at the time of his trial and appeal caselaw existed criticizing "dishonesty type language."  *See, e.g.*, *United States v. Panarella*, 277 F.3d 678, 698 (3d Cir. 2002).  As a result,

Third, Ragbir could have brought his ineffective assistance of counsel claims at least six years earlier. Counsel's alleged failures to adequately investigate the loss[30] and obtain expert testimony[31] were actionable by 2006, if not on direct appeal. Ragbir could have also raised his affirmative misadvice argument by 2006.[32] *Lafler* and *Frye* do not justify

Ragbir could have reasonably asserted that the scheme or artifice to defraud instruction was flawed. Whether our caselaw was still evolving is of no moment: if a claim can be reasonably made, then legal ambiguity is not a sound reason for delay.

[30] *See Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (finding "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

[31] *See, e.g.*, *Jacobs v. Horn*, 395 F.3d 92, 109 (3d Cir. 2005) (evaluating claim of ineffective assistance of counsel for failure to introduce expert testimony); *Raley v. Ylst*, 470 F.3d 792, 799-801 (9th Cir. 2006) (addressing whether failure to present expert testimony constituted ineffective assistance of counsel); *Horsley v. Alabama*, 45 F.3d 1486, 1493-96 (11th Cir. 1995) (determining that failure to present expert psychological witness did not amount to ineffective assistance of counsel); *Spencer v. Murray*, 18 F.3d 229, 231-36 (4th Cir. 1994) (discussing whether failure to secure expert witness was ineffective assistance of counsel); *Bruns v. Thalacker*, 973 F.2d 625, 628-29 (8th Cir. 1992) (examining whether lack of expert testimony constituted ineffective assistance of counsel); *St. Louis v. Carroll*, 429 F. Supp. 2d 701, 710-11 (D. Del. 2006) (holding that failure to obtain expert testimony was not ineffective assistance of counsel); *Venezia v. United States*, 884 F. Supp. 919, 923-24 (D.N.J. 1995) (reviewing claim of ineffective assistance of counsel for failure to present expert testimony).

[32] Several cases would have supported a pre-*Padilla* misadvice claim. *See, e.g.*, *Kwan*, 407 F.3d 1005; *United States v. Couto*, 311 F.3d 179 (2d Cir. 2002); *Downs-Morgan v. United States*, 765 F.2d 1534 (11th Cir. 1985); *United States v. Shaw*, No. 03-6759, 2004 WL 1858336 (E.D. Pa. Aug. 11, 2004); *United States v. Khalaf*, 116 F. Supp. 2d 210 (D. Mass. 1999).

Ragbir's delay since they adopted previously established law.[33] Thus, sufficient caselaw already existed such that Ragbir could have reasonably brought his ineffective assistance of counsel claims much earlier. *Mendoza*, 690 F.3d at 160.

Fourth, the allegedly vague "scheme or artifice to defraud" instruction was fair game on direct appeal or soon afterward.[34] In *United States v. Panarella*, we acknowledged that the breadth of the term "fraud" in federal statutes may raise concerns regarding "notice of criminality." 277 F.3d at 698. We also observed, in *United States v. Leahy*, the increasing criticism in the courts of the formulation of fraud in federal statutes. 445 F.3d 634, 649-51 (3d Cir. 2006) (citing *Panarella*, 277 F.3d at 698; *Matter of EDC, Inc.*, 930 F.2d 1275, 1281 (7th Cir. 1991); *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987)). Based on this caselaw, we conclude there was no sound reason for failing to raise this issue in 2002 or 2006.

Fifth, considerations of finality, judicial efficiency, and potential prejudice towards the government—if a new trial or re-sentencing is ordered—also counsel against concluding there were sound reasons for delay.[35] After examining our caselaw and the record before us, we conclude that Ragbir had the ability to bring all his claims at least six years before his

---

[33] *Lafler v. Cooper*, 566 U.S. 156, 164 (2012) (citing *United States v. Rodriguez Rodriguez*, 929 F.2d 747, 753 n.1 (1st Cir. 1991) (per curiam); *United States v. Gordon*, 156 F.3d 376, 380-381 (2d Cir. 1998) (per curiam); *United States v. Day*, 969 F.2d 39, 43-45 (3d Cir. 1992); *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981); *Julian v. Bartley*, 495 F.3d 487, 498-500 (7th Cir. 2007); *Wanatee v. Ault*, 259 F.3d 700, 703-704 (8th Cir. 2001); *Nunes v. Mueller*, 350 F.3d 1045, 1052-1053 (9th Cir. 2003); *Williams v. Jones*, 571 F.3d 1086, 1094-1095 (10th Cir. 2009) (per curiam); *United States v. Gaviria*, 116 F.3d 1498, 1512-1514 (D.C. Cir. 1997) (per curiam)).

[34] Contrary to Ragbir's assertion, there was a remedy available for his vagueness claims on direct review. *See Panarella*, 277 F.3d at 698.

[35] Ragbir, who has already served his sentence, does not address how a new trial or resentencing, which could theoretically result in an increased penalty, would comport with the double jeopardy clause.

2012 petition for coram nobis. He provides no sound reason for his delay.

## V

Coram nobis is an extraordinary remedy, available only when all its conditions have been met.[36] Ragbir's claims fail to satisfy at least one necessary requirement.[37] Accordingly, we will affirm the District Court's denial of the petition.

---

[36] In some circumstances, overlap may exist between the coram nobis elements of "sound reasons for delay" and "no available remedy at the time of trial." While Ragbir lacks "sound reasons" for his delay, many of his claims also fail to satisfy the "no available remedy at the time of trial" requirement.

The lack of expert testimony at trial could have been raised on appeal. *See supra* note 31. Similarly, Ragbir's vagueness claim could likely have been brought on direct review. *See Panarella*, 277 F.3d at 698. We have also already concluded that Ragbir's willful blindness and scheme or artifice to defraud claims were available at the time of trial. *See supra* note 29.

[37] In addition to a lack of "sound reasons for delay," we fail to see any claim that constitutes a "fundamental error."