**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| HECTOR MANUEL CERVANTES-TORRES, AKA Hector Manuel Cervantes, AKA Manuel Hector Cervantes, AKA Hector Cervantes-Torres, | No.23-55617 |
|  | D.C. No. 8:13-cr-00206-DOC |
| *Petitioner-Appellant*, |  |
| v. | ORDER AND AMENDED OPINION |
| UNITED STATES OF AMERICA, |  |
| *Respondent-Appellee*. |  |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted September 10, 2024
Pasadena, California

Filed June 24, 2025
Amended March 13, 2026

Before: Ryan D. Nelson, Eric D. Miller, and Roopali H. Desai, Circuit Judges.

Order;
Opinion by Judge R. Nelson;
Concurrence by Judge R. Nelson;
Dissent by Judge Desai

## SUMMARY[*]

### Coram Nobis

The panel filed (1) an order denying a petition for panel rehearing and a petition for rehearing en banc and (2) an amended opinion affirming the district court's partial denial of Hector Cervantes-Torres's petition for writ of coram nobis in which Cervantes-Torres sought to vacate his convictions under 18 U.S.C. § 922(g).

In 2014, a jury convicted Cervantes-Torres of being a felon in possession of a firearm (18 U.S.C. § 922(g)(1)), possessing a firearm as an alien unlawfully present in the United States (18 U.S.C. § 922(g)(5)), and being an alien found unlawfully present in the United States following deportation (8 U.S.C. § 1326).

Five years after Cervantes-Torres's convictions, the Supreme Court held that a defendant's knowledge that he belongs to a relevant category of persons barred from possessing a firearm is a necessary element of a § 922(g) conviction. *See Rehaif v. United States*, 588 U.S. 225, 237 (2019). In 2021, Cervantes-Torres filed a coram nobis

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

petition in which he sought to vacate his § 922(g)(1) and § 922(g)(5) convictions because no *Rehaif* instruction was given at trial. The district court granted the petition as to the § 922(g)(1) conviction but denied it as to the § 922(g)(5) conviction.

One of the requirements for coram nobis relief is that there was an error of the most fundamental character. The government argued that Cervantes-Torres did not satisfy this requirement.

The panel held that even under the standard of review that would govern a direct appeal—that is, ignoring the fact that the postconviction nature of a coram nobis petition demands more—Cervantes-Torres cannot prevail. Because Cervantes-Torres did not object to the *Rehaif* error at trial, plain error review would apply on direct appeal, meaning that Cervantes-Torres would have needed to show a "reasonable probability" of a different outcome had the jury received the correct *Rehaif* instruction. The panel rejected an approach under which no consideration of probability is required and under which the failure to give the *Rehaif* instruction is itself fundamental error. The panel thus assumed review under a plain error standard.

The panel held that there is no reasonable likelihood that the jury would have reached a different result even if a *Rehaif* instruction had been given because (1) Cervantes-Torres was physically deported in 2003; (2) Cervantes-Torres admitted that, in 2012, he received and read a letter from the United States Citizenship and Immigration Services informing him that he did "not have lawful permanent resident status"; and (3) a sticker that Cervantes-Torres claims the government gave him that purportedly extended his green card expired before Cervantes-Torres was

arrested.  On these facts, Cervantes-Torres could not obtain relief, even on a direct appeal.  As a result, any error stemming from a failure to give a *Rehaif* instruction cannot be of the most fundamental character.

Judge R. Nelson concurred.  Noting that the majority resolves the case narrowly on the facts, he wrote separately to explain why Cervantes-Torres's coram nobis claim fails legally and why coram nobis should be limited.  Historically, the writ of error coram nobis was limited to correcting a narrow range of factual errors.  Until the 1950s, federal courts held that the common-law writ was displaced by positive law.  Then, in *United States v. Morgan*, 346 U.S. 502 (1954), the Supreme Court abruptly changed course, holding that the writ could be used in federal courts to correct some legal errors.  As a result, usage of the writ has become unmoored from history and tradition and the original public meaning of the All Writs Act.  The writ should be trimmed down to its appropriate historical size, and ideally, the Supreme Court would readopt its traditional position that the writ has been superseded by positive law.

Judge Desai dissented.  She wrote that the district court's failure to provide a *Rehaif* instruction is fundamental error that warrants coram nobis relief.  She wrote that even under the majority's "plain error" standard of review, Cervantes-Torres is entitled to coram nobis relief because if the jury were properly instructed, there is more than a reasonable probability of a different result, as Cervantes-Torres presented significant evidence that he thought he was a lawful permanent resident and the failure to give a *Rehaif* instruction influenced every aspect of the trial, rendering it irregular and invalid.

## COUNSEL

Katherine K. Windsor (argued), Law Office of Katherine Kimball Windsor, Pasadena, California, for Petitioner-Appellant.

Robert J. Keenan (argued), Assistant United States Attorney, Office of the United States Attorney, United States Department of Justice, Santa Ana, California; Amy E. Pomerantz and Alexander P. Robbins; Assistant United States Attorney; Joseph T. McNally, Assistant United States Attorney; Acting Chief, Criminal Division; Bram M. Alden and David R. Friedman, Assistant United States Attorneys, Chiefs, Criminal Appeals Section; Bilal A. Essayli, Acting United States Attorney; E. Martin Estrada, United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Respondent-Appellee.

## ORDER

Judge R. Nelson and Judge Miller voted to deny the petition for panel rehearing. Judge Desai voted to grant the petition for panel rehearing. Judge R. Nelson and Judge Miller voted to deny the petition for rehearing en banc, and Judge Desai voted to grant the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc and no judge has sought a vote on whether to rehear the matter en banc. Fed. R. App. P. 40(c). Appellant's petition for panel rehearing and petition for rehearing en banc (Dkt. 36) is **DENIED**.

No further petitions for panel rehearing or petitions for rehearing en banc will be entertained.

---

# OPINION

R. NELSON, Circuit Judge:

Hector Cervantes-Torres appeals the partial denial of his petition for a writ of error coram nobis. He seeks to vacate his prior conviction for possessing a firearm as "an alien . . . unlawfully in the United States." 18 U.S.C. § 922(g)(5). Five years after his conviction, the Supreme Court held that a defendant's knowledge that he belongs to a relevant category of persons barred from possessing a firearm is a necessary element of a § 922(g) conviction. *See Rehaif v. United States*, 588 U.S. 225, 237 (2019).

At trial, the jury heard that Cervantes-Torres (1) had been lawfully removed and re-entered the country unlawfully, (2) later falsely claimed otherwise in a renewed green card application, (3) received and read an official letter informing him that he did not have lawful status in the United States following his removal and was subject to a 10-year bar against reentry, and (4) had only an expired green card by the time of his arrest, meaning he lacked any valid documentation purporting to allow him to be in the country legally. Given this overwhelming evidence that Cervantes-Torres was aware of his unlawful status, no jury would have reached a different verdict even if a *Rehaif* instruction had been given. Accordingly, the district court did not err in partially denying his petition. We affirm.

# I

## A

Hector Cervantes-Torres was born in Mexico. At age 13, he came with his family to the United States, settling in Orange County. Later, he became a legal permanent resident.

In 1994, not long after becoming a permanent resident, Cervantes-Torres pleaded guilty in California state court to possessing cocaine—a felony. *See* Cal. Health & Safety Code § 11350(a). Cervantes-Torres served a brief sentence and crossed paths with the law several more times in his teens, being convicted of misdemeanor burglary of a vehicle, domestic violence, and forgery.

Because of his felony drug conviction, the government launched removal proceedings in 1996, serving him with an order to show cause and notice of hearing that charged him with removability and set bail at $25,000. Cervantes-Torres appeared at the hearing.[1] There, he was ordered deported from the United States to Mexico. The Board of Immigration Appeals summarily affirmed the order of removal.

In 2003, Cervantes-Torres was physically deported to Mexico. He was warned that he was barred from re-entering the country for 10 years. A week later, however, he re-entered the United States through a port of entry. He claims that he did so by presenting a green card that officials failed to seize from him when he was deported.

---

[1] During Cervantes-Torres's subsequent criminal trial and elsewhere, the parties erroneously suggested that Cervantes-Torres failed to appear and was ordered removed *in absentia*.

In 2012, Cervantes-Torres's felony drug conviction was expunged by a California Superior Court. *See* Cal. Pen. Code § 1203.4. Later that year, Cervantes-Torres requested a replacement green card. On his application, he falsely stated that he had never been ordered deported. His application was denied. U.S. Citizenship and Immigration Services (USCIS) informed Cervantes-Torres in a letter denying his application that he had been "ordered deported . . . by an Immigration Judge" and was, "in fact, deported to Mexico." USCIS had "no record reflecting that" Cervantes-Torres "subsequently regained lawful permanent resident status." Cervantes-Torres was also informed that his deportation made him subject to a 10-year "bar for re-entry to the United States," as he had been warned when he was deported. The denial letter concluded, "you do not have lawful permanent resident status."

Despite the denial letter, Cervantes-Torres claims that he was given a sticker by the government to place on his green card that purported to extend its validity through April 2013.

In October 2013, Immigration and Customs Enforcement (ICE) officers came to believe that Cervantes-Torres possessed firearms as a felon and an alien unlawfully present in the United States. Agency officers arrested Cervantes-Torres in his home. During the arrest, agency officers observed long guns in Cervantes-Torres's home.

B

Cervantes-Torres was taken into custody and charged on three counts: (1) for being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1); (2) for possessing a firearm as an alien unlawfully present in the United States, *see id.* § 922(g)(5); and (3) for being an alien found unlawfully

present in the United States following deportation, *see* 8 U.S.C. § 1326.

Against the advice of counsel (who advised him to plead guilty), Cervantes-Torres went to trial in 2014. He stipulated to his felony conviction and several facts related to the firearms. His defense centered mainly on his assertion that he was lawfully present in the United States—or, at the very least, that he believed that he was.

Accordingly, much of his defense concerned what the district court dubbed the "mystical, magical green card with the extension on it"—that is, Cervantes-Torres's purported extension sticker. The parties volleyed arguments about whether the sticker was valid or not, and whether it had been erroneously issued. The jury heard that Cervantes-Torres received and read the USCIS letter in 2012, well before his arrest. It also heard that the green card extension sticker was expired when Cervantes-Torres was arrested.

At the time, the law did not require that the jury be instructed that a conviction under § 922(g)(1) or (5) required a finding that Cervantes-Torres knew that he was a felon or an illegal alien, respectively. No such instruction was given. Cervantes-Torres did not object to the instructions on that basis.

Cervantes-Torres was convicted on all three counts. The district court sentenced him to 27 months in federal custody, below the guidelines range of 41–51 months. We affirmed the conviction. *See United States v. Cervantes-Torres*, 622 F. App'x 634 (9th Cir. 2015). Cervantes-Torres served his sentence and was released from immigration custody on bond.

While the federal criminal proceedings were ongoing, Cervantes-Torres applied for asylum and withholding of removal. By the parties' last representation, the application for withholding of removal remains pending.

In 2019, a California Superior Court found that Cervantes-Torres's defense counsel in the felony drug prosecution failed to adequately advise him of the immigration consequences of a guilty plea, thereby prejudicing him. Cervantes-Torres was permitted to withdraw his plea, and that conviction was vacated. *See* Cal. Pen. Code § 1385.

C

Five years after Cervantes-Torres's federal convictions, the Supreme Court held that a defendant's knowledge that he belongs to a relevant category of persons barred from possessing a firearm is a necessary element of a § 922(g) conviction. *See Rehaif*, 588 U.S. at 237. In 2021, Cervantes-Torres filed a petition for writ of error coram nobis. He sought to vacate his convictions under § 922(g)(1) and (g)(5) because no *Rehaif* instruction was given at trial.[2]

The district court—the same judge who presided over the trial—relied on our prior decision in *United States v. Michell*, 65 F.4th 411, 414 (9th Cir. 2023), to conclude that it would need to find a "reasonable probability" that the jury would have reached a different verdict had it received a *Rehaif* instruction.

The court granted the petition as to the § 922(g)(1) conviction but denied it as to the § 922(g)(5) conviction. On

---

[2] Cervantes-Torres did not challenge his conviction under 8 U.S.C. § 1326.

the § 922(g)(1) conviction, the district court concluded that there was a reasonable probability that a jury could find that the 2012 expungement of his felony drug conviction led Cervantes-Torres to believe that he was no longer a felon for purposes of § 922(g)(1).  So a *Rehaif* instruction may have led to a different outcome.

As for § 922(g)(5), however, the district court concluded that there was no such reasonable probability.  First, the district court emphasized that Cervantes-Torres had been deported and later "admitted that he falsified information on his . . . application for a replacement permanent residence card."[3]  If Cervantes-Torres truly believed that the deportation had been an error (and that he was correctly allowed reentry), the district court suggested that he would not have marked on the form that he had never been deported.  Second, the district court concluded that it was clear that Cervantes-Torres was on notice that he was not lawfully present in the United States because USCIS told him so in the letter denying his replacement card.  The court noted that Cervantes-Torres received and read the letter.

So between the physical deportation, the falsified statement on an application for a replacement card, and a letter explaining that Cervantes-Torres was not legally in the United States, the district court decided that no reasonable jury could conclude that Cervantes-Torres was unaware of his illegal status at the time he possessed the firearms.  Cervantes-Torres timely appealed.

---

[3] The dissent places the blame on Cervantes-Torres's tax preparer.  *See* Dissent 51.  But Cervantes-Torres certified that the form was correct under penalty of perjury.

## II

The district court had jurisdiction under 18 U.S.C. § 3231. *See Matus-Leva v. United States*, 287 F.3d 758, 759 (9th Cir. 2002); *United States v. Denedo*, 556 U.S. 904, 912–13 (2009). We have jurisdiction under 28 U.S.C. § 1291. We review the denial of a writ of error coram nobis de novo. *United States v. Kwan*, 407 F.3d 1005, 1011 (9th Cir. 2005).

## III

### A

The parties dispute the appropriate legal standard. Because Cervantes-Torres's arguments fail under any of the proposed standards, however, we conclude that he is not entitled to relief. The extraordinary remedy of a writ of error coram nobis is available only where a petitioner can show four things: (1) the unavailability of a more usual remedy; (2) valid reasons for the delay in challenging the conviction; (3) adverse consequences from the conviction sufficient to satisfy Article III's case-and-controversy requirement; and (4) an error of the most fundamental character. *United States v. Kroytor*, 977 F.3d 957, 961 (9th Cir. 2020).

Cervantes-Torres contends that he has carried his burden on all four fronts. The government answers only as to the fourth requirement, arguing that the instructional error at trial was not of the most fundamental character. Accordingly, we consider only the writ's fourth requirement. This poses the question: what does it mean for an error to be of the most fundamental character? *Cf. Kroytor*, 977 F.3d at 961.

1

Because coram nobis proceedings are a form of collateral review, *Wall v. Kholi*, 562 U.S. 545, 552 (2011), Cervantes-Torres necessarily "must clear a significantly higher hurdle than would exist on direct appeal," *United States v. Frady*, 456 U.S. 152, 166 (1982). On direct appeal, because Cervantes-Torres did not object to the claimed *Rehaif* error at trial, he would have had to show a "reasonable probability" of a different outcome but for the error. *Michell*, 65 F.4th at 414.

The parties disagree about how to apply these principles in this collateral review. The government urges us to impose a "cause and actual prejudice" standard of review. Under that standard, a petitioner must show both (1) cause excusing a failure to directly challenge the defaulted claim and (2) actual prejudice resulting from the complained-of error. *Frady*, 456 U.S. at 167. Following from the cause-prejudice standard, the government would also have us demand that Cervantes-Torres show a "*substantial* likelihood"—rather than a reasonable probability—that a properly instructed jury would have reached a different result. *Id.* at 172 (emphasis added).

Cervantes-Torres sticks to the reasonable-probability standard. He also suggests that the "substantial likelihood" standard is nearly indistinguishable from the standard that the district court employed. Under either standard, Cervantes-Torres argues, he has shown a sufficient likelihood that the result would have been different had the *Rehaif* instruction been given.

We decline, however, to explore these legal questions. At bottom, this appeal turns on the facts, and we decide "no more than is necessary." *United States v. Stauffer Chem.*

*Co.*, 464 U.S. 165, 174 (1984). Even under the legal standard of review that would govern a direct appeal—that is, ignoring the fact that the postconviction nature of a coram nobis petition demands more—Cervantes-Torres's arguments fail. Even Cervantes-Torres does not argue that the standard of review on collateral review should be more deferential than on direct appeal.

Cervantes-Torres did not object to the *Rehaif* error at trial. So plain error would apply on direct appeal. *See United States v. Olano*, 507 U.S. 725, 731–37 (1993). This means that Cervantes-Torres would have needed to show a "reasonable probability" of a different outcome had the jury received the correct *Rehaif* instruction. *Michell*, 65 F.4th at 414; *see United States v. Marcus*, 560 U.S. 258, 262 (2010). He cannot do so, and that resolves the case. After all, if an error is not plain, it cannot be of the most fundamental sort, either. *See United States v. Mayer*, 235 U.S. 55, 69 (1914) (explaining that, at common law, the requirement that an error be "of the most fundamental character" meant that the error must have "rendered the proceeding itself irregular and invalid").

Having decided as much, the "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *Teter v. Lopez*, 125 F.4th 1301, 1309 (9th Cir. 2025) (en banc) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)).

The dissent would have us break new ground and hold that no consideration of probability is required. We reject that approach. While we need not decide which standard of review controls this fact-bound case, Supreme Court

precedent establishes that we must consider the probability of a different result.

2

The dissent rejects any consideration of probability and instead applies a per se rule under which the failure to give the *Rehaif* instruction is itself fundamental error. *See* Dissent 44–47, 56–57. The dissent claims that *United States v. McClelland*, 941 F.2d 999 (9th Cir. 1991), mandates this result. Under the dissent's reading, we must issue a writ of coram nobis any time a jury instruction "relieved the prosecution from its burden of proving an essential element of the offense." *McClelland*, 941 F.2d at 1003. Not even Cervantes-Torres raises this argument. And for good reason. The dissent's strained reading of *McClelland* (which we have never adopted in more than three decades) is not faithful to our decision in that case; but even if it were, it would have been superseded by intervening authority from the Supreme Court.

In *McClelland*, we considered a coram nobis petition that involved an objection that the defendant had preserved. As we explained, McClelland challenged the jury instructions "at every juncture of his proceedings" including "both on direct appeal and in his request for collateral relief." 941 F.2d at 1001 n.2. This fact matters. At the time of our decision in 1991, the Supreme Court had long held that the "cause and actual prejudice" standard governed federal collateral challenges to convictions when petitioners raised constitutional errors for the first time on collateral review. *See Frady*, 456 U.S. at 167. The standard for preserved errors was less clear. The Supreme Court had yet to address whether a different standard controlled when a petitioner asserted an error which he had preserved on direct review.

In fact, only two years after *McClelland*, the Court noted that it had "at most assumed" plain-error review was appropriate for habeas petitions asserting a preserved error. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). Thus, although plain error might have applied to preserved errors, the Supreme Court had left the issue for the circuits to resolve.

*McClelland* had to fill that gap. But whichever rule our court adopted in *McClelland*, it could apply only to *preserved* objections because the Supreme Court had already ruled that the "cause and actual prejudice" standard applied to unpreserved errors. *See Frady*, 456 U.S. at 167. Thus, even if *McClelland* adopted a per se rule for preserved instructional errors, that holding would not govern here. *See* 941 F.2d at 1001 n.2. That should end the matter. Cervantes-Torres did not raise the *Rehaif* error at trial or on direct appeal.

The dissent reads *McClelland*'s silence about prejudice to mean that it does not require any prejudice analysis for a petition for coram nobis asserting an instructional error. This extends the holding beyond its context. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) ("[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."). In context, *McClelland*'s silence reflected the Supreme Court's silence on the standard for preserved errors on collateral review—nothing more.

But even if the dissent's unnatural reading of *McClelland* were correct, it would be clearly irreconcilable with intervening Supreme Court precedent. In cases after *McClelland*, the Supreme Court has repeatedly mandated

that we must review "a jury instruction that omits an element of the offense" under, at minimum, the harmless-error standard. *Neder v. United States*, 527 U.S. 1, 8 (1999). The Supreme Court has rejected the suggestion that "the omission of an element will *always* render a trial unfair." *Id.* at 9. In particular, "*Rehaif* errors fit comfortably within the general rule that a constitutional error does not automatically require reversal of a conviction." *Greer v. United States*, 593 U.S. 503, 514 (2021) (cleaned up).

To be sure, these intervening Supreme Court decisions arose in direct appeals. On direct appeal, Rule 52(a) requires "harmless error" review of preserved errors and Rule 52(b) requires "plain error" review for forfeited errors. *See* Fed. R. Crim. P. 52; *see also id.* 51(b) (parties must preserve errors through objections to the trial court). But the Supreme Court's underlying reasoning governs here as well. It would not make sense to have a lower bar for postconviction coram nobis petitioners' *Rehaif* claims than for those of direct appellants. *See Kholi*, 562 U.S. at 552 (discussing coram nobis as a form of collateral review). We have never adopted a per se rule of reversal in this context, and Supreme Court precedent forecloses that approach. *See Frady*, 456 U.S. at 166. The Supreme Court's reasoning thus would "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).

Intervening Supreme Court precedent rejects the proposition that an erroneous jury instruction violates a "structural" right that "require[s] automatic vacatur in *every case*." *Greer*, 593 U.S. at 512–13. Such a per se rule does not apply to *Rehaif* errors because those errors "do not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."

*Greer*, 593 U.S. at 513 (emphasis and internal quotation marks removed) (quoting *Neder*, 527 U.S. at 9). And if such errors do not necessarily lead to fundamental unfairness for purposes of Rule 52, they are necessarily not automatic errors of a "most fundamental nature." *See Miller*, 335 F.3d at 900; Fed. R. Crim. P. 52.

We thus assume review under a plain error standard.

B

There is no reasonable probability of a different outcome even if a *Rehaif* instruction had been given. Three facts developed at trial make this conclusion inescapable.[4] First, Cervantes-Torres was physically deported in 2003. In 1996, Cervantes-Torres appeared before an immigration judge and was ordered removed. He appealed that decision to the Board of Immigration Appeals (BIA), which affirmed the immigration judge's removal order. Cervantes-Torres did not petition this court for review of the BIA's order. Any confusion he claims about whether the government had made a final decision to remove him must have been dispelled when he was arrested in his home, bused to a port of entry, and told to cross the border.

That Cervantes-Torres managed to re-enter the country soon after is minimally relevant—if at all—to the question of his knowledge of his illegal status. Even if his entry were "procedurally regular" (because he "presented himself to the border officials, he showed them his (invalid) alien

---

[4] Cervantes-Torres moved to supplement the record with a recording and transcript of his 1996 deportation hearing. Although they were discussed by the parties' memoranda before the district court (and at oral argument), these materials were omitted by error or accident by defense counsel. We grant Cervantes-Torres's motion and expand the record. *See* Fed. R. App. P. 10(e)(2).

registration card, and they allowed him physically to enter the country"), that is just as probative of an intent to "dupe border officials" as it is of anything else.  *See Tamayo-Tamayo v. Holder*, 725 F.3d 950, 952 (9th Cir. 2013); *accord Tellez v. Lynch*, 839 F.3d 1175, 1178–79 (9th Cir. 2016).

If nothing else, it would have been unreasonable for Cervantes-Torres to believe that the green card of a recently deported immigrant was, in fact, valid or would allow him legal reentry—even if border officials failed to confiscate it from him.  "[D]eportation *itself* is sufficient to impress upon the mind of the deportee that return is forbidden." *United States v. Torres-Echavarria*, 129 F.3d 692, 698 (2d Cir. 1997) (emphasis added).  Cervantes-Torres's false statement in his later application that he had never been deported further suggests that he knew that his status was unfavorable in applying for the replacement permanent resident card.  As the district court noted, it is one thing to believe that the deportation was an administrative error.  It is another thing to say that it never happened.  Even—or perhaps especially—if the deportation were an error, Cervantes-Torres would be certain to remember it.  After all, Cervantes-Torres "obviously" knew he had been deported, and "[n]o one . . . could innocently assume that the INS is a travel agency" or that return is permissible. *United States v. Carlos-Colmenares*, 253 F.3d 276, 278 (7th Cir. 2001) (quoting *Torres-Echavarria*, 129 F.3d at 698).

Second, Cervantes-Torres admitted that, in 2012, he received and read the letter from USCIS informing him that he did "not have lawful permanent resident status."  On the off chance that Cervantes-Torres believed he had legal status, the letter cleared up any uncertainty: After noting that Cervantes-Torres was "ordered deported," the letter

informed him that he was subject to a 10-year "bar for re-entry to the United States."

That letter also specified that USCIS had "no record reflecting that [Cervantes-Torres] subsequently regained lawful permanent resident status[] through a lawful re-admission to the United States" after his deportation. By 2012, Cervantes-Torres could not have had a reasonable belief that he was lawfully present in the United States or that his reentry was permissible.

Finally, Cervantes-Torres points to the sticker that he claims the government gave him that purportedly extended his green card. He says that the sticker made him believe he was lawfully present in the United States. But even if Cervantes-Torres believed the sticker were genuine and not issued by mistake, that sticker purported to extend the card's expiration date only to April 2013—six months before Cervantes-Torres was arrested.[5]

So even if the jury believed that Cervantes-Torres was under the impression that he retained lawful status after he was physically deported and that the letter from USCIS did not mean what it said, the jury still would find him with nothing but an expired sticker on an invalid green card. By the time of Cervantes-Torres's arrest, he had no documentation or plausible excuse that would suggest he was lawfully present in the United States.

---

[5] The dissent does not meaningfully address the card's April expiration date. *See* Dissent 52. It notes that Cervantes-Torres "received conflicting information from various official immigration sources," and suggests he may have been confused. But even accepting that he believed the green card was valid and properly issued, it was, on its face, invalid.

*     *     *

To recap, Cervantes-Torres was deported from the United States after his valid removal order was affirmed by the BIA.   Even so, he later stated—falsely—that his deportation never happened.  The government explained in writing that he lacked lawful status in the United States and was barred from re-entering the United States for 10 years following his deportation.   When he was arrested and charged under § 922(g)(5), all he had to explain himself was an expired sticker.  The jury heard all of this.  Based on these facts, there is no reasonable likelihood that the jury would have reached a different result even had a *Rehaif* instruction been given.  No juror who heard the evidence at trial could conclude that Cervantes-Torres lacked knowledge of his immigration status.[6]

On these facts, Cervantes-Torres could not obtain relief, even on a direct appeal.  As a result, any error stemming from a failure to give a *Rehaif* instruction could not have been "of the most fundamental character."  *Kroytor*, 977 F.3d at 961 (quotation omitted).  To conclude otherwise—or to suggest that an error can be of the most fundamental sort even if not plain—would disregard binding precedent.

## IV

Cervantes-Torres was convicted under § 922(g)(5) by a jury of his peers for possessing a firearm as an alien unlawfully present in the United States.  Several years later,

---

[6] The dissent suggests that the "very fact that the record supports opposing conclusions" about Cervantes-Torres's knowledge "requires us to grant coram nobis relief."  Dissent 53; *see also id.* at 47–48.  But this is not summary judgment, and "society's legitimate interest in the finality of the judgment" demands that we apply more searching review. *Frady*, 456 U.S. at 164.

the Supreme Court held that an alien must know his unlawful immigration status.  *See Rehaif*, 588 U.S. at 237.  Even if the jury had been correctly instructed on that requirement, however, there is no reasonable probability that it would have reached anything but the original verdict.  Because any error at trial was not plain (given the failure to object), it cannot be of the most fundamental sort.  Cervantes-Torres's arguments to the contrary overlook the overwhelming evidence marshalled against him at trial.

**AFFIRMED.**

---

R. NELSON, Circuit Judge, concurring:

The majority resolves this case narrowly on the facts because Cervantes-Torres's claims are unbelievable and there is no reasonable probability of a different outcome even if the jury had been correctly instructed under *Rehaif v. United States*, 588 U.S. 225 (2019).  *See* Maj. 18–20.  I write separately to explain why Cervantes-Torres's coram nobis claim fails legally and why coram nobis should be limited. That doctrine is deeply ahistorical and needs to be revisited.

Historically, the writ of error coram nobis was limited to correcting a narrow range of factual errors.  Until the 1950s, federal courts held that the common-law writ was displaced by positive law.  Then, in a single decision, the Supreme Court abruptly changed course, holding that the writ could be used in federal courts to correct some legal errors.  As a result, usage of the writ has become unmoored from history and tradition and the original public meaning of the All Writs Act.

The writ should not be expanded as the dissent suggests. *See* Dissent 44–47, 56–57. On the contrary, the writ should be trimmed down to its appropriate historical size. Ideally, the Supreme Court would readopt its traditional position that the writ has been superseded by positive law.

## I

Today, the writ of coram nobis allows those who have completed their criminal sentences to seek vacatur of their convictions. *See United States v. Crowell*, 374 F.3d 790, 794 (9th Cir. 2004). It has become a companion to the writ of habeas corpus for those no longer in custody. *Id.* This modern form of the writ, however, bears little resemblance to the traditional writ. We have, in effect, substituted the true writ of coram nobis for something else—a habeas analogy for those too late to use habeas relief.

In case we haven't stretched the writ past its breaking point already, the dissent would go even further, allowing the writ to issue even where habeas would not. This is wrong under our existing doctrine. *See* Maj. 14–18. And against the backdrop of history, tradition, and the original public meaning of the All Writs Act, the dissent's errors demonstrate just how far afield some judges will stretch a once-modest writ.

## A

Start with the writ's history. As Judge Easterbrook recognized, "the history is largely English" and, after the Founding, "the practice largely State." *United States v. Bush*, 888 F.2d 1145, 1146 (7th Cir. 1989). The precise origins of the writ are unclear. *See Ragbir v. United States*, 950 F.3d 54, 60 n.5 (3d Cir. 2020). But by the middle of the 16th century, English courts had devised writs to correct

factual errors that lie outside the record. *See* W.W. Thornton, *Coram Nobis et Coram Vobis*, 5 Ind. L.J. 603, 605, 611–12 (1930).

The writ of coram nobis differed from a traditional writ of error. *See Strode v. Stafford Justs.*, 23 F. Cas. 236, 236–37 (C.C.D. Va. 1810) (differentiating between writs of error of the writ of coram nobis). Traditional writs of error permitted review of some legal errors. *See* Abraham L. Freedman, *The Writ of Error Coram Nobis*, 3 Temp. L.Q. 365, 366 (1929). But the writ of coram nobis was available only where "a judgment . . . [was] erroneous in the matter of *fact* only, and not in point of law." 2 William Tidd, The Practice of the Courts of King's Bench, And Common Pleas, in Personal Actions, and Ejectment 1190–91 (2d Am. ed. 1794) (derived from 8th Eng. ed.); *accord* John W. Kyle, *Nature and Origin of Writs under the Common Law*, 24 Miss. L.J. 1, 5 (Dec. 1952).

Litigants could sue out the writ only "to call up facts which were unknown to the court at the time of judgment and which were not inconsistent with the record." Note, *The Writ of Error Coram Nobis*, 37 Harv. L. Rev. 744, 744 (1924) [hereinafter *Writ of Error*]. Indeed, the writ would only lie "in a court which [could] summon a jury to investigate the alleged error in fact if a dispute should arise to its existence." Freedman, *supra*, at 371. Even so, this did not include newly discovered evidence, which may have been addressed by other writs. *See id.* at 393. So, in addition to "clerical errors," the writ covered a narrow range of factual errors. *Writ of Error*, *supra*, at 745.

By the nineteenth century, the writ was "hoary with age"—even "obsolete in England before the time of Blackstone." *Anderson v. Buchanan*, 292 Ky. 810, 822

(1943) (Sims, J., dissenting) (citing *Mitchell v. State*, 179 Miss. 814 (1937)); *accord Pickett's Heirs v. Legerwood*, 32 U.S. (7 Pet.) 144, 147 (1833).  The writ was later abolished altogether in England by Parliament's passage of the Common Law Procedure Act.  *Writ of Error*, *supra*, at 745 & n.17.

B

Despite its disuse in England by the Founding, some American jurisdictions imported the writ.  In early federal practice, "coram nobis maintained its traditional function as a means for trial courts to correct factual errors in previously decided cases from earlier judicial terms."  David Wolitz, *The Stigma of Conviction: Coram Nobis, Civil Disabilities, and the Right to Clear One's Name*, 2009 BYU L. Rev. 1277, 1283–84 & n.24.  Soon after the Founding, however, the availability of the writ in federal courts was "doubtful." *See Writ of Error*, *supra*, at 746.  Still, it reared its head at times.  *See United States v. Morgan*, 346 U.S. 502, 509–10 & nn.16–18 (1954) (collecting cases).

In the middle of the nineteenth century, Justice Nathan Clifford noted that use of the writ in federal court had never been blessed by the Supreme Court.  *United States v. Plumer*, 27 F. Cas. 561, 573 (C.C.D. Mass. 1859) (Clifford, J.) (citing *Pickett's Heirs*, 32 U.S. at 144–49).  He "conclud[ed] that the writ did not exist in the federal courts," *Bush*, 888 F.2d at 1146, at least in criminal cases, *see* M. Diane Duszak, *Post-McNally Review of Invalid Convictions Through the Writ of Coram Nobis*, 58 Fordham L. Rev. 979, 982 (1990).  It had been "substantially superseded by the practice of a petition."  *United States v. Plumer*, 27 F. Cas. 551, 561 (C.C.D. Mass. 1859) (Clifford, J.).  The writ was

also universally understood to lie only when "an error is one of fact, and not of law." *Plumer*, 27 F. Cas. at 573.

Some states used the writ.[1]   As in England, the writ would issue only in courts that could summon juries to investigate issues of fact.   *See* Freedman, *supra*, at 371. When it was used, the Court noted that "[t]he cases for error coram vobis[] are enumerated without any material variation in all the books of practice, and rest on the authority of the sages and fathers of the law." *Pickett's Heirs*, 32 U.S. at 148.

In 1881, the Supreme Court repeated Justice Clifford's doubts that the writ could be used in federal courts. *Bronson v. Schulten*, 104 U.S. (14 Otto) 410, 417 (1881).   By that time in some states, however, the writ issued "in a class of cases not well defined, and about which and about the limit of this exception these courts are much at variance." *Id.* at 416.   In one state, the contemporary writ was decried as "the wild ass of the law which the courts cannot control." *Buchanan*, 292 Ky. at 822 (Sims, J., dissenting).

In any event, the writ was generally only sustained in cases "in which the error was committed [regarding] some matter of fact which had escaped attention, and which was material in the proceeding." *Bronson*, 104 U.S. at 416; *accord Collins v. State*, 66 Kan. 201, 202 (1903).   The writ generally would not lie "because of something that occurred after the judgment [was] rendered[,] which would have been a good defense if it had occurred before the trial." Thornton, *supra*, at 609–10.   And the writ had "never been granted to

---

[1] Other States—Massachusetts, for example—made no use of the writ because their appellate regime provided for review of questions of fact. *See Writ of Error*, *supra*, at 746.

relieve from consequences arising subsequently to the judgment." *Id.* (quotation omitted).

The "archaic" writ, *Mitchell*, 179 Miss. at 747, nonetheless trended towards disuse in America altogether, *Ragbir*, 950 F.3d at 61. Motion practice (or more developed forms of habeas relief) filled the void in most states. *Id.*; *Bronson*, 104 U.S. at 416–17. In many states, criminal codes superseded the writ, democratically displacing the writ. *See Ragbir*, 950 F.3d at 61; *Bronson*, 104 U.S. at 416–17. As one state court characterized the problem, "we are not disposed to dig into the musty archives of the past to resurrect and revivify ancient and wornout writs that have long since been discarded and forgotten." *Boyd v. Smyth*, 200 Iowa 687, 694 (1925). In some cases, the common-law writ was abolished expressly. *See, e.g.*, *Writ of Error*, *supra*, at 746 & n.27 (collecting cases and scholarship).

## C

In 1907, the Supreme Court recognized that, in federal court, "[t]he writ is no longer in use, but its objects are attained by motion." *Wetmore v. Karrick*, 205 U.S. 141, 151 (1907). Soon after, the Court again expressed doubt that the writ applied in federal court. *See United States v. Mayer*, 235 U.S. 55, 69 (1914). Even assuming it did apply, the writ was acknowledged to be "of limited scope," allowing a court "to vacate its judgments for errors of fact existed, as already stated, in those cases where the errors were of the most fundamental character; that is, such as rendered the proceeding itself irregular and invalid." *Id.*

Following *Wetmore* and *Mayer*, some federal courts concluded that the writ had no place in federal courts. *E.g.*, *United States v. Port Wash. Brewing Co.*, 277 F. 306, 314 (E.D. Wis. 1921); *United States v. Luvisch*, 17 F.2d 200, 202

(E.D. Mich. 1927).  Our own court decided as much when we held that "[t]he common-law remedy by such writ has been superseded in the federal courts by motion addressed to the court whose judgment is attacked."  *Robinson v. Johnston*, 118 F.2d 998, 1000 (9th Cir. 1941), *vacated*, 316 U.S. 649 (1942).[2]  Some of our sister circuits did much the same.  *E.g.*, *Strang v. United States*, 53 F.2d 820, 821 (5th Cir. 1931); *Allen v. United States*, 162 F.2d 193, 194 (6th Cir. 1947).

Through the middle of the twentieth century, positive law continued to fill the role of the writ in federal courts. Rule 60 of the Federal Rules of Civil Procedure relieved a party of judgment in civil actions given certain factual mistakes and expressly abolished the writ of coram nobis. *See United States v. Keogh*, 391 F.2d 138, 140 (2d Cir. 1968) (Friendly, J.).  And Rules 33, 35, and 36 of the Federal Rules of Criminal Procedure allowed for the limited correction of errors in criminal proceedings.  *See United States v. Smith*, 331 U.S. 469, 475 (1947); *Ragbir*, 950 F.3d at 61. Additionally, Congress enacted 28 U.S.C. § 2255 to provide relief "in the nature of . . . coram nobis" for federal prisoners.  *See United States v. Hayman*, 342 U.S. 205, 216–17 (1952).  Although not exactly coterminous with the traditional writ, these developments "undermined the usefulness" of the writ and suggested sustained transition to alternative avenues of correcting errors.  *See Ragbir*, 950 F.3d at 61.

---

[2] The Supreme Court's vacatur of *Robinson* is unrelated to the writ of coram nobis.  *See Robinson v. Johnston*, 130 F.2d 202, 202 (9th Cir. 1942); *accord Robinson v. United States*, 394 F.2d 823, 823 & n.1 (6th Cir. 1968).

In the wake of the Federal Rules, the Supreme Court repeated its nearly century-old refrain and cast more doubt about whether the writ of coram nobis remained viable.  For example, the Court noted that "it is difficult to conceive of a situation in a federal criminal case today where [coram nobis] would be necessary or appropriate."  *Smith*, 331 U.S. at 475 n.4.  Beyond the modification of judgments "obtained by fraud," the Court suggested that whether the writ of coram nobis survived the Federal Rules was academic.  *Id.*

The Court reiterated this point the next year in *Taylor v. Alabama*, noting that although the writ "survives in varying forms in state practice," "it may be that in federal practice its purpose is otherwise served," pointing to the Federal Rules of Criminal Procedure.[3]  335 U.S. 252, 259 (1948).

Following the promulgation of the Federal Rules, more courts joined the chorus and decided the writ was superseded.  *E.g.*, *United States v. Kerschman*, 201 F.2d 682, 684 (7th Cir. 1953).  Thus, the Court—and several circuits— acknowledged that the writ was moribund by the middle of the twentieth century.  Much like in England a century before, the American iteration of the writ of coram nobis fell into disuse and "all but died."  Wolitz, *supra*, at 1284.

## D

This all changed when the Supreme Court reversed course in 1954.  *See Morgan*, 346 U.S. at 513.  *Morgan* is generally understood to have revived the writ of coram nobis in federal courts.  *See id.* at 509 & n.15.  But, more

---

[3] At least one district court in our own circuit similarly suggested that Rule 33 of the Federal Rules of Criminal Procedure took the place of the writ.  *See United States v. Landicho*, 72 F. Supp. 425, 428–29 (D. Ala. 1947).

accurately, *Morgan* invented a new sort of collateral remedy—a repackaged writ of habeas corpus for those no longer in custody—and called it coram nobis.

In *Morgan*, the Court affirmed the Second Circuit, which concluded that the writ would lie where a petitioner had ostensibly been "deprived of his common law right to be represented by counsel." *United Stated v. Morgan*, 202 F.2d 67, 68 (2d Cir. 1953). The writ could issue under these circumstances because such an error would be "of the most fundamental character." *Morgan*, 346 U.S. at 511–12. Morgan cites *Mayer* for this "most fundamental character" standard. But *Mayer* discusses the writ's application in the context of "*errors of fact* . . . of the most fundamental character." 235 U.S. at 69 (emphasis added). So, in remaking the writ, *Morgan* mischaracterized *Mayer*.

*Morgan* thus "transformed" the writ "from its traditional function as a means for curing *factual* errors, unknown to the trial court, to a new function of curing any error of 'the most fundamental character,' including legal error," Wolitz, *supra*, at 1286; *cf. id.* at 1289 (including "errors that were unknown (and unknowable) to the convicting court"), borrowing from its habeas jurisprudence, *see Morgan*, 346 U.S. at 505 n.3 (citing *Darr v. Burford*, 339 U.S. 200, 203–04 (1950)).

This result was jarring and, as the dissent noted, a complete remaking of the writ. *Id.* at 518 (Minton, J., dissenting). The dissent rightly took issue with the majority's treatment of the All Writs Act. *Id.* at 515. In its view, issuance of the writ could not be "in aid of" the district court's jurisdiction about a completed sentence because the court's jurisdiction was exhausted when the sentence was completed. *See id.* at 515–16.

The dissent took aim at the majority's expansion of the writ to cover legal error, recognizing that the modern writ could not be "agreeable to the usages and principles of law" because it exceeded the writ's traditional limits. *Id.* at 516–18. Moreover, Rule 60 of the Federal Rules of Civil Procedure "expressly abolishe[d]" the writ and precluded its use because proceedings under the writ necessarily retain a "civil character." *Id.* at 517–18. And even if the Rules of Civil Procedure were inapplicable, § 2255 superseded the writ. *Id.* at 518–19; *contra Hayman*, 342 U.S. at 214–19.

Even after *Morgan*, the writ remains something of "a phantom in the Supreme Court's cases, appearing occasionally but only in outline." *Bush*, 888 F.2d at 1146. The Court has acknowledged that the ancient writ was designed "to correct errors of fact," *United States v. Denedo*, 556 U.S. 904, 910–11 (2009) (quoting *Morgan*, 346 U.S. at 507), while conceding that the traditional writ is "superseded" by *Morgan*'s expanded writ, *see id.* And the Court has repeated that "it is difficult to conceive of a situation in a federal criminal case today where [coram nobis] would be necessary or appropriate." *Carlisle v. United States*, 517 U.S. 416, 429 (1996) (quoting *Smith*, 331 U.S. at 475 n.4). This sounds like judicial buyer's remorse.

In the lower courts, however, the writ appears more often, having become a "companion writ to habeas corpus."[4] Wolitz, *supra*, at 1287; *see, e.g.*, *United States v. Doe*, 867 F.2d 986, 988 (7th Cir. 1989). This includes, for example, cases where intervening law has invalidated theories of

---

[4] This is true even in circuits—like ours—that have characterized the writ as permitting correction of "errors of fact." *E.g.*, *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987) (quoting *Mayer*, 235 U.S. at 69).

conviction, *see United States v. Walgren*, 885 F.2d 1417, 1420 (9th Cir. 1989), and claims of ineffective assistance of counsel, *United States v. Rad-O-Lite of Phila., Inc.*, 612 F.2d 740, 744 (3d Cir. 1979).

Lower courts' use of the writ proves *Morgan*'s profound effect on the law. All at once, the humble, fact-focused writ traversed obscurity and came to rival the Great Writ itself (that is, the writ of habeas corpus). Four hundred years of common law were dashed away following one particularly pioneering and poorly reasoned opinion in 1954.

## II

The modern writ of coram nobis hardly bears resemblance to the ancient writ. These days, the writ refers to a very different judicial enterprise than existed at common law. And that deviation from the writ's origins has meaningful consequences. First, nothing empowers federal courts to issue such a broad writ. Second, legislative interventions challenge whether such sweeping authority should be used to modify final judgments, particularly in criminal cases. It's time to take a hard look at the role the writ should play in our law.

## A

Start with the first point. The All Writs Act, adopted by the First Congress, empowered federal courts "to issue writs of *scire facias*, *habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." Judiciary Act of 1789, § 14, 1 Stat. 73, 81–82; *cf. Morgan*, 346 U.S. at 506 n.7. In doing so, the Act necessarily preserved writs fixed as

they existed in 1789. *Bush*, 888 F.2d at 1146 (the All Writs Act "preserves rather than enlarges customary writs").

That is, after all, how the Court has understood other writs preserved by the Act—fixed and properly construed by "resort[ing] to the common law," acknowledging that any enlargement of a writ is a job for Congress. *Hayman*, 342 U.S. at 210–11; *accord id.* at 221 & n.35 (considering pre-Founding common law to construe boundaries of writs preserved by All Writs Act); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 94 (1807) (similar).

The All Writs Act does not allow creating some new "writ" to reach desired ends—even if that new writ masquerades in the name of an old one. *Cf. Shoop v. Twyford*, 596 U.S. 811, 820–21 (2022); *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) ("Although [the All Writs Act] empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate."); *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32–33 (2002) (same). After all, "the power to award the writ by any of the courts of the United States, must be given by written law." *Bollman*, 8 U.S. at 94.

The ancient, fact-focused writ of coram nobis existed in 1789. So that is at most what is preserved by the All Writs Act. The modern take on the writ did not exist at the time of the Act and is not "necessary for the exercise of [courts'] jurisdictions and agreeable to the principles or usages of law." 28 U.S.C. § 1651(a). The Court's new writ provides jurisdiction where there would be none, in clear contravention of the plain language of the All Writs Act. *See Morgan*, 346 U.S. at 515–16 (Minton, J., dissenting).

Tidd's Practice—the relevant volume being from 1794—explains the state of the writ in 1789, emphasizing that the writ lies only where "a judgment . . . be erroneous in the matter of *fact* only, and not in point of law." 2 Tidd, *supra*, at 1190–91. Under the All Writs Act, this is the only circumstances in which the writ may issue.

## B

Even if the courts are to employ a judge-made writ, unhampered by the original public meaning of any democratically enacted statute, we should at least "abide by the history and tradition." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008); *see also Pa. Bureau of Corr.*, 474 U.S. at 45 (Stevens, J., dissenting) (same); *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 62 (2024) (Thomas, J., concurring in part) (same). Otherwise, what constrains us but our own private sensibilities and sense of what is just? *Cf.* Dissent 55–56.

And history and tradition lead us to the same result. "History limits the writ to factual questions that have not been litigated before." *Bush*, 888 F.2d at 1146. Nothing more. As discussed above, *see supra* 23–32, until the latter half of the twentieth century, the historical and traditional use of the writ is clear. A single Supreme Court opinion that abruptly broke step with this centuries-long tradition should give way to the overwhelming heft of history. Like all legal doctrines, the writ of coram nobis could only be "wrenched" from its "judicial origin and etiology" and "mechanically transplanted into an alien, unrelated context" (here— application to legal errors) by "suffering mutilation [and] distortion." *Reid v. Covert*, 354 U.S. 1, 50 (1957) (Frankfurter, J., concurring in the result); *accord Denedo*, 556 U.S. at 922 (Roberts, C.J., concurring in part and

dissenting in part). *Morgan* is, in short, precisely the sort of twentieth-century innovation that a jurisprudence of history and tradition should correct.

Some members of the Court have gestured toward such a return to history and tradition. *See Denedo*, 556 U.S. at 924–25 (Roberts, C.J., concurring in part and dissenting in part); *see also Carlisle*, 517 U.S. at 429 (discussing the writ in its traditional form and eliding *Morgan*'s innovations). Restoring the writ's historical and traditional scope would give due regard to "sages and fathers of the law" that developed and refined the writ over the centuries, calibrating its boundaries to properly fit a mature system of criminal adjudication. *See Pickett's Heirs*, 32 U.S. at 148.

Abiding by history and tradition would also stymie further deviations and postmodern developments in the writ threatened by some contemporary jurists who would further alienate the writ from its roots. *See infra*, at 39–43.

C

The modern iteration of the writ should also be rejected because it has been superseded by positive law. So beyond merely trimming the writ down to size, it is time to pluck the writ out of federal practice.

"The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute." *Pa. Bureau of Corr.*, 474 U.S. at 43. Litigants "may not, by resorting to the All Writs Act, avoid complying with" rules of procedure. *See Syngenta Crop Prot.*, 537 U.S. at 32–33. This means that "where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Id.* (quotation omitted); *accord Carlisle*, 517 U.S. at 429. Since positive law

addresses the issues the writ covers, the writ has been superseded by legislative action.

First, as the Court suggested before *Morgan*, the writ was superseded even before the adoption of the Federal Rules by federal criminal codes and motion practice.  As Justice Clifford noted, the writ "had been substantially superseded by the practice of a petition" even before 1859. *Plumer*, 27 F. Cas. at 561.  Several generations of Supreme Court justices echoed this doubt about the writ's existence in federal courts—at least four times between 1859 and the promulgation of the Federal Rules. *See id.*; *Bronson*, 104 U.S. at 417; *Wetmore*, 205 U.S. at 151; *Mayer*, 235 U.S. at 67–69.

Second, Rule 60 of the Federal Rules of Civil Procedure abolished the writ—even when used to attack criminal judgments. *See* Comment, Brendan W. Randall, United States v. Cooper: *The Writ of Error Coram Nobis and the* Morgan *Footnote Paradox*, 74 Minn. L. Rev. 1063, 1067–68 (1990).  Rule 60 is clear:  "[t]he following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela."  Fed. R. Civ. P. 60(e).

*Morgan*, in a footnote, confused the Rule's plain text, suggesting that invoking the writ by motion "is a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil proceeding."   346 U.S. at 505 n.4 (capitalization normalized).  In that same footnote, however, it also said that such a motion "is of the same general

character as one under 28 U.S.C. § 2255."[5]  *Id.*  These two statements create a paradox, but the second statement is ultimately correct:  it does not matter whether these writs are used to attack criminal judgments because they, themselves, start proceedings civil in nature—much like § 2255 and habeas.  *See Kerschman*, 201 F.2d at 684.  As a result, Rule 60 abolished the writ in all contexts.  *See Morgan*, 346 U.S. at 518 (Minton, J., dissenting).

But even if proceedings under the writ should be considered criminal in nature, the result is the same.  The Federal Rules of Criminal Procedure supersede the writ by "specifically address[ing] the particular issue at hand," *Pa. Bureau of Corr.*, 474 U.S. at 43, namely, the correction of errors.  In particular, the work of the writ is accomplished by Rules 33, 35, and 36 of the Federal Rules of Criminal Procedure.

Start with Rule 33 (New Trial).  That Rule, much like the traditional writ, permits criminal defendants to escape final judgments given factual errors where "the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 provides for new trials given the discovery of "error occurring at the trial or for reasons which were not part of the court's knowledge at the time of judgment."  *Smith*, 331 U.S. at 475.  It is hard to imagine a clearer codification of the writ.

In some ways, admittedly, the Rule is narrower than the writ—for example, by imposing time limits on motions given the sorts of error alleged.  *Compare* Fed. R. Crim P. 33(b), *with* Freedman, *supra*, at 394 (coram nobis is not

---

[5] A § 2255 motion was then considered to be an independent civil action comparable to habeas corpus, *see Heflin v. United States*, 358 U.S. 415, 418 n.7 (1959), and so these two statements are inconsistent, Randall, *supra*, at 1071.

subject to statute of limitations). But in other ways, it is much broader than the traditional writ: for example, it permits a new trial based on newly discovered evidence. *Compare* Fed. R. Crim. P. 33(b)(1), *with* Freedman, *supra*, at 393–94 (the writ "will not lie on the ground of newly discovered evidence"). In any case, it is directed to the same issue as the writ. *See* Freedman, *supra*, at 367, 403. It merely reflects a different balancing of finality and correctness adopted by democratic process. Indeed, "the writ of error coram nobis was frequently referred to" during the drafting of Rule 33. Lester B. Orfield, *The Writ of Error Coram Nobis in Federal Criminal Cases*, 14 S.D. L. Rev. 1, 7 (Winter 1969). At least one circuit judge (Judge John B. Sanborn of the Eighth Circuit) believed that Rule 33 would preempt the writ. *See id.* at 9.

And Rule 33 works with other Federal Rules of Criminal Procedure. Rule 35(a) permits the correction of errors "that resulted from arithmetical, technical, or other clear error" in sentencing. Like the writ of coram nobis, Rule 35 thus permits the correction of clerical and related administrative errors, in addition to other clear errors. *See Writ of Error*, *supra*, at 745. At least one court has held that a petitioner seeking a writ of coram nobis to attack an earlier conviction because of insanity should instead proceed under Rule 35. *Byrd v. Pescor*, 163 F.2d 775, 779 (8th Cir. 1947).

Rule 36 (Clerical Error) expands Rule 35, permitting the correction of "a clerical error in a judgment, order, or other part of the record" and record errors "arising from oversight or omission." This, like Rule 35, codifies the writ's traditional use for correcting clerical and administrative errors. *See Writ of Error*, *supra*, at 745.

Accordingly, Rules 33, 35, and 36 of the Federal Rules of Criminal Procedure together serve the purpose of the writ, thereby superseding it. *Cf. Taylor*, 335 U.S. at 259 & n.5. Again, given these developments, by 1947 it was already "difficult to conceive of a situation" in which issuance of the writ "would be necessary or appropriate," *Smith*, 331 U.S. at 475 n.4, a sentiment the Court reiterated after *Morgan, see Carlisle*, 517 U.S. at 429. *Smith*, *Taylor*, and *Carlisle* are a clear continuation of pre-Rules authorities that suggested much the same thing—the writ ceded its place to positive law.

### III

This is not merely an academic exercise: the logic of the dissent shows how the modern iteration of the writ could be transformed into something even more unwieldy if handled without care and an eye to history and tradition.

### A

As the majority explains, Cervantes-Torres's petition fails even under the modern writ's expanded boundaries after *Morgan*. *See* Maj. 18–20. Granting coram nobis relief here would conflict with the Court's clear directives. After all, "it is difficult to conceive of a situation in a federal criminal case today where [coram nobis] would be necessary or appropriate." *Smith*, 331 U.S. at 475 n.4; *Carlisle*, 517 U.S. at 429 (quoting same).

An erroneous jury instruction given several years before *Rehaif* is not such a criminal case where the writ is appropriate, however. Several *Rehaif* instructional claims have arisen in our court—on direct appeal, § 2255 petitions, and now in coram nobis petitions. *See, e.g.*, *United States v. Pollard*, 20 F.4th 1252, 1255 (9th Cir. 2021) (§ 2255);

*United States v. Michell*, 65 F.4th 411, 414 (9th Cir. 2023) (direct appeal); *United States v. Gear*, 9 F.4th 1040, 1047 (9th Cir. 2021) (same). We denied relief in each of those circumstances. Accordingly, this common error does not qualify as an "extraordinary" case presenting sufficiently "compelling" circumstances under the modern coram nobis standard. *See Denedo*, 556 U.S. at 911 (quotation omitted).

In arguing otherwise, the dissent relies almost entirely on two of our post-*Morgan* cases: *Walgren*, 885 F.2d at 1417, and *United States v. McClelland*, 941 F.2d 999 (1991).[6] The dissent overlooks that these cases are part of a distinct line of authorities following a blockbuster Supreme Court decision that marked a sea change in mail and wire fraud law. *See* Duszak, *supra*, at 984–85, 987–89; *see McNally v. United States*, 483 U.S. 350, 360–61 (1987) (rejecting intangible-rights theory of liability under mail and wire fraud statutes).

*Walgren* is like other post-*McNally* cases. *See United States v. Marcello*, 876 F.2d 1147, 1150 (5th Cir. 1989) (collecting cases). The problem in *Walgren* was a reliance on a rejected theory of harm, not just an omitted or faulty instruction. 885 F.2d at 1422–23. Accordingly, by its own logic, *Walgren* is directed to a different sort of legal error than the one here. *Walgren* says nothing about errors like Cervantes-Torres's alleged instructional glitch, which would not have resulted in a different outcome even if corrected.

---

[6] *Walgren* departed from our sister courts by entertaining a writ of coram nobis in the absence of a showing of ongoing civil disabilities. *See* Wolitz, *supra*, at 1302–03. In an appropriate case, we should revisit whether we should join the "majority of circuit courts supporting the civil disabilities test . . . . championed by Judge Easterbrook and adopted throughout the country." *Id.* at 1303.

Unlike *Walgren*, the outcome here would have been no different had the error been corrected, meaning that the error was not of the most fundamental character. To illustrate this point: where circuits found that the outcome would have been the same even if the *McNally* error had been corrected, they affirmed the pre-*McNally* convictions. *E.g.*, *United States v. Osser*, 864 F.2d 1056, 1063–64 (3d Cir. 1989). Properly understood, then, not even *Walgren* and the other post-*McNally* cases suggest that coram nobis permits an end run around probabilistic judgments in collateral postconviction litigation.

The Third Circuit stated it best: "An error which could be remedied by a new trial, such as an error in jury instructions, does not normally come within the writ." *United States v. Stoneman*, 870 F.2d 102, 106 (3d Cir. 1989) (citing *Mayer*, 235 U.S. at 69). So *Walgren* is inapt. As is *McClelland*, for much the same reasons.

### B

The writ of coram nobis was never meant to be as capacious as habeas corpus, which has long been understood to be much broader. *See Hayman*, 342 U.S. at 216–17 (quotation omitted). But dissatisfied with even that, the dissent would make coram nobis relief *more lenient* than habeas relief, relieving those who seek the writ of showing a reasonable probability of a different outcome but for an alleged legal error that was not preserved or was procedurally defaulted. *See* Dissent 44–47, 56–57; *see also Pollard*, 20 F.4th at 1255 (affirming the denial of habeas relief for an unpreserved *Rehaif* instructional error—just like this one—because the petitioner failed to show a reasonable probability of a different outcome but for the error); *accord*

*United States v. Frady*, 456 U.S. 152, 162–63 (1982).  This would be a rather stunning development.

Not only that, it would make the bar for coram nobis relief even lower than on direct appeal on an unpreserved claim.  *See Michell*, 65 F.4th at 414 (applying plain error and affirming convictions despite alleged *Rehaif* instructional error because the appellant failed to show a reasonable probability of a different outcome but for the error); *Gear*, 9 F.4th at 1047 (same).   This contradicts well-settled principles of postconviction review of final judgments.  *See Frady*, 456 U.S. at 162–63, 166–67; *Wall v. Kholi*, 562 U.S. 545, 552–53 (2011).

*Morgan* and its applications in the lower courts are ahistorical.  While *Morgan* and our circuit precedent binds us, we should endeavor not to break new ground or expand ahistorical precedents.  *See Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 945 (9th Cir. 2021) (R. Nelson, J., dissenting from the denial of rehearing en banc).  Applying the writ of coram nobis here would extend *Morgan* down erroneous and ahistorical paths.

And while Cervantes-Torres's petition fails under *Morgan*, it is dead on arrival under a historical analysis.  Historically, "[t]he writ of error coram nobis does not lie to attack erroneous instructions."  Orfield, *supra*, at 6.  And the writ does not lie "because of something that occurred after the judgment [was] rendered[,] which would have been a good defense if it had occurred before the trial," such as intervening changes in the law.  Thornton, *supra*, at 609–10.  So under the writ, correctly construed, Cervantes-Torres's petition is a complete category failure.

A judge may imagine a system of criminal adjudication that she thinks is more just.  But it's not just to create a

bespoke system of adjudication that changes to fit our idiosyncratic sentiments.  Neither is it just to bend established doctrines out of shape to create more lenient pathways to results we like.  It is just to apply the law and stay the course of history and tradition and respect the legal contours adopted by the democratic branches of the greatest republic the world has ever known.

IV

"Any system of justice requires a compromise between finality and accuracy."  *Bush*, 888 F.3d at 1150; *accord Morgan*, 346 U.S. at 519–20 (Minton, J., dissenting).  Here, as always, there is deep wisdom in history and tradition:  the proper compromise was found by the slow accretion of Anglo-American common law.  It was then democratically confirmed by the First Congress, which elected to preserve the traditional regime of English writs.  The Federal Rules again settled on a carefully calibrated, democratically legitimate balance.  *See Smith*, 331 U.S. at 476.  "If that is to be changed, Congress should do it."  *Morgan*, 346 U.S. at 520 (Minton, J., dissenting).

When the Supreme Court abruptly changed course, it threw that balance into radical disequilibrium.  It put off the lessons of tradition and let the archaic "wild ass of the law" back into federal courts, bucking and kicking.  *Buchanan*, 292 Ky. at 822 (Sims, J., dissenting).  The best way forward for the writ of coram nobis is a return to history and tradition.  This is the only way that the writ can truly be said to "rest on the authority of the sages and fathers of the law." *Pickett's Heirs*, 32 U.S. at 148.

DESAI, Circuit Judge, dissenting:

It is a bedrock due process principle that the government must prove each element of the crime charged to secure a criminal conviction. When an improper jury instruction "relieve[s] the prosecution from its burden of proving an essential element of the offense[,] . . . the error is a fundamental one and justifies the collateral relief of *coram nobis*." *United States v. McClelland*, 941 F.2d 999, 1003 (9th Cir. 1991); *see also United States v. Walgren*, 885 F.2d 1417, 1423–27 (9th Cir. 1989). The government charged Hector Cervantes-Torres with possession of a firearm as an unlawful noncitizen under 18 U.S.C. § 922(g). To be convicted under § 922(g), the government must prove that the defendant knew of his unlawful status; knowledge is an essential element of the offense. *Rehaif v. United States*, 588 U.S. 225, 227 (2019). But the court did not instruct the jury at Cervantes-Torres's trial that the prosecution must prove this essential element. Even worse, at closing, the prosecutor misled the jury, stating that "the government [did] not have to prove" that Cervantes-Torres knew of his unlawful status. The jury instructions "relieved the prosecution from its burden of proving an essential element of the offense[,]" *McClelland*, 941 F.2d at 1003, and even under the majority's "plain error" standard of review, Cervantes-Torres is entitled to coram nobis relief.

## I. Failure to provide a *Rehaif* instruction is fundamental error that warrants coram nobis relief.

Improper jury instructions are appropriate grounds for coram nobis relief. Since 1989, this court has granted the writ when improper jury instructions result in a conviction "for an act [that] is not a crime." *Walgren*, 885 F.2d at 1420. Unless the government proves "beyond a reasonable

doubt . . . every fact necessary to constitute the crime," a conviction cannot stand. *McClelland*, 941 F.2d at 1003 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Thus, the government's burden to prove every element of an offense is "of the most fundamental nature." *Id.*

Cervantes-Torres was charged with possession of a firearm as an unlawful noncitizen under 18 U.S.C. § 922(g), and an essential element of that offense is knowledge of one's unlawful status. *Rehaif*, 588 U.S. at 232. The requirement to prove that the defendant knows of his unlawful status is no mere technicality. Far from it. "[P]ossession of a gun can be entirely innocent. . . . It is therefore the defendant's *status*, and not his conduct alone, that makes the difference. Without knowledge of that status, the defendant . . . lack[s] the intent needed to make his behavior wrongful." *Id.* In other words, knowledge of one's status is not only *an* essential element of the offense but *the* essential element—it is the element that transforms innocent behavior into criminal conduct. Thus, jury instructions for a § 922(g) offense must include a *Rehaif* instruction—that is, an instruction that the government must prove the defendant's knowledge of his unlawful status. *See id.* at 228, 237; *United States v. Gear*, 9 F.4th 1040, 1043–44, 1045 (9th Cir. 2021) (per curiam). Without such an instruction, the government is relieved of its burden to prove the only element of the offense that makes the possession of a firearm wrongful. *See Gear*, 9 F.4th at 1045.

This case presents a textbook example of this principle. Like many law-abiding gun owners, Cervantes-Torres owned rifles because he was an avid hunter. He enjoyed hunting with his two sons and was an active member of a hunting club. He maintained a California hunting license and applied for nineteen deer tags over several hunting seasons.

By owning hunting rifles, Cervantes-Torres participated in a constitutional right. *See D.C. v. Heller*, 554 U.S. 570, 580 (2008). And he believed he was entitled to exercise that right because he thought he was a lawful permanent resident.

At trial, the government did not disprove Cervantes-Torres's belief that he was a lawful permanent resident. It instead told the jury that his "confusion" about his status was irrelevant, and the district court instructed the jury that all the government had to prove was that Cervantes-Torres owned the rifles and was in the country unlawfully. But that is not enough. The Supreme Court's *Rehaif* decision is unequivocal—without proof beyond a reasonable doubt that Cervantes-Torres knew he was in the country unlawfully, Cervantes-Torres committed no crime. 588 U.S. at 232. Because the district court failed to instruct the jury on an essential element of § 922(g), it "relieved the prosecution from its burden" to prove Cervantes-Torres's knowledge of his status. *See McClelland*, 941 F.2d at 1003; *Walgren*, 885 F.2d at 1424.

Our precedent signals that the inquiry ends there. In other words, when the government is "permitted to sidestep [the] requirement" to prove each element of the charged offense beyond a reasonable doubt, "the error is a fundamental one and justifies the collateral relief of *coram nobis*." *McClelland*, 941 F.2d at 1003. Full stop. Unlike the majority here, *McClelland* did not require the defendant to satisfy an additional prejudice requirement. *Id.* Nor did *McClelland* suggest that whether the defendant preserved the error determines whether a prejudice analysis is required on a

coram nobis petition.[1] *See id.* As the majority notes, however, intervening Supreme Court precedent has held that erroneous jury instructions must be analyzed—at least on direct appeal—under Rule 52's harmless error or plain error standards. *See Neder v. United States*, 527 U.S. 1, 8 (1999); *Greer v. United States*, 593 U.S. 503, 513–14 (2021). Although *Neder* and *Greer* did not involve coram nobis petitions, their reasoning calls into question whether we should continue to apply *McClelland* as a per se rule.

To the extent we can still rely on *McClelland*, it is clear that the failure to instruct the jury on an element of the offense is a fundamental error. But even if a defendant must clear the additional hurdle of showing prejudice resulting from the error, Cervantes-Torres easily clears it here.

## II. If the jury were properly instructed, there is a reasonable probability of a different result.

My colleagues assert that we must apply plain error review, and Cervantes-Torres cannot show a "reasonable probability" that a properly instructed jury would have reached a different outcome. Opinion at 14–15. I disagree.

---

[1] I am not persuaded by the majority's argument that *McClelland* declined to consider prejudice only because the defendant had preserved his objection to the error. In a footnote, *McClelland* mentioned that the defendant objected to the jury instruction on direct appeal and collateral attack. 941 F.2d at 1001 n.2. The footnote appears after the general statement that "a defendant may be denied the benefit of a new rule of law on collateral attack of his conviction if the rule is announced and he fails to raise it before his direct appeals are exhausted." *Id.* at 1001 (citing *Davis v. United States*, 417 U.S. 333, 345 (1974)). In other words, the court emphasized that the defendant did not fail to preserve the challenge *after* the new rule of law was announced. *Id.* But the court did not suggest that whether it analyzes prejudice as part of the fundamental error analysis hinges on whether the objection was preserved.

For every conclusion the majority draws, Cervantes-Torres presents evidence to the contrary. There is more than enough evidence to create reasonable doubt as to Cervantes-Torres's knowledge of his status. Indeed, the focus of the entire trial was whether Cervantes-Torres was in the country unlawfully. And despite attempts by counsel and the court to constrain his testimony, Cervantes-Torres maintained at trial that he believed he was a lawful permanent resident.

## A. Cervantes-Torres presents significant evidence that he thought he was a lawful permanent resident.

Cervantes-Torres became a legal permanent resident in 1992, when he was sixteen. In 1994, he was arrested for possession of cocaine. He pleaded guilty and received a 90-day sentence. Two years later, Cervantes-Torres was placed in removal proceedings because of his felony conviction. He appeared before an Immigration Judge ("IJ") for a deportation hearing without representation.

The IJ—speaking to Cervantes-Torres through a Spanish language interpreter—found him deportable and ordered him removed. Cervantes-Torres was confused about why he was detained and had trouble understanding the proceedings. He believed he was detained because he was not carrying his green card, and he asked the IJ if he could resolve the matter by presenting his green card to immigration authorities. The IJ reinforced this belief, asking Cervantes-Torres repeatedly if he had any documentation, and reminding him that it was his burden to provide documentation of his lawful status. Compounding the confusion, the IJ declared Cervantes-Torres ineligible for release on bond, yet Cervantes-Torres was released on a $3,000 bond just two weeks later. He went home, believing that any

misunderstanding about his lawful residence had been cleared up.

The confusion surrounding Cervantes-Torres's deportation hearing persisted at trial, where the government argued that Cervantes-Torres was ordered removed *in absentia*. Cervantes-Torres confirmed this in cross-examination, stating, "It wasn't because of the criminal conviction. That is not deportable. They deported me because I never appeared in court." This mistake was included in other documents, including Cervantes-Torres's 2013 motion to reopen, his coram nobis petition, and the district court's final order. Thus, even at trial, Cervantes-Torres was confused about how, when, and why he was deported—and so were his counsel, the prosecutor, and the court.

Six years after his deportation hearing, Cervantes-Torres applied for a new driver's license. Immigration officers flagged the license and went to Cervantes-Torres's home and detained him. They put him on a bus to San Ysidro and directed him to walk across the border to Mexico. At no point did any officer or agent confiscate his green card. Cervantes-Torres did not know why he was being deported, and believed the officers were making a mistake.

He re-entered the United States a week later by presenting his green card at the San Ysidro Port of Entry. After inspection, he was admitted by border patrol agents. Cervantes-Torres's admittance by border patrol agents confirmed his belief that his green card was still valid, and that his deportation was in error.

The majority finds Cervantes-Torres's physical deportation dispositive, concluding that his re-entry is simply evidence of an attempt to "dupe border officials."

Opinion at 19. But whether Cervantes-Torres "duped" border officials or genuinely believed that he could lawfully enter the United States because he possessed a valid green card is precisely the question that should have been presented to the jury at trial. Citing a series of cases that have nothing to do with a § 922(g) offense, the majority attempts to disguise its own assessment of the evidence as black letter law, as though there were a legal presumption that all reentries with invalid documentation are the result of nefarious deception. Opinion at 19. To be clear, no such presumption exists. The cases cited by the majority have nothing to say about the effect of a "procedurally regular" entry on a non-citizen's knowledge of their legal status for the purposes of a § 922(g) offense. *See e.g.*, *Tamayo-Tamayo v. Holder*, 725 F.3d 950, 952 (9th Cir. 2013). Indeed, none of the cases cited by the majority involve a statute that possesses any knowledge requirement at all. *See, e.g.*, *id.*[2]

After returning from Mexico, Cervantes-Torres spent the next ten years acting consistently with his belief that he was a lawful permanent resident. Far from avoiding authorities for fear of being caught, Cervantes-Torres regularly and willingly interacted with institutions where his unlawful

---

[2] *See Tamayo-Tamayo*, 725 F.3d at 952 (holding that 8 U.S.C. § 1231(a)(5), which reinstates a prior order of removal if a non-citizen "reentered the United States illegally," applies even if a non-citizen is inspected at the border and allowed into the country by border officials); *Tellez v. Lynch*, 839 F.3d 1175, 1178–79 (9th Cir. 2016) (same); *United States v. Carlos-Colmenares*, 253 F.3d 276 (7th Cir. 2001) (interpreting 8 U.S.C. § 1326, which makes a crime to be "found in" the United States without the express consent of the Attorney General, and holding that "intent to reenter the country without the Attorney General's express consent is not an element of section 1326."); *United States v. Torres-Eschavarria*, 129 F.3d 692 (2d Cir. 1997) (same).

status might put him at risk. For example, he maintained a California hunting license and applied for 19 deer tags over several hunting seasons. He paid his taxes. He successfully sought to overturn his conviction for possession of cocaine. He maintained a California driver's license—the very identification that triggered his deportation by immigration officers in 2003. And he always kept his green card in his wallet as proof of his lawful status.

Furthermore, in April 2012, when his green card was about to expire, Cervantes-Torres applied for a replacement card, again suggesting that he believed he had a valid green card. The majority makes much of a statement on Cervantes-Torres's application for a new green card that he had never been deported, insisting that Cervantes-Torres "falsified" his immigration history on his application. Opinion at 11, 19. But as Cervantes-Torres repeatedly asserted at trial, he did not lie on his application. Although he readily acknowledged that the information about his deportation was wrong, he maintained that he completed the application in good faith and did not falsify any information, explaining that he had employed his tax preparer, Tuning Acosta, to help him with the application, and Acosta never asked him about his deportation.  Yet again, the majority presents their own assessment of the evidence as undisputed fact, mischaracterizing the record and eliding Cervantes-Torres's countervailing testimony.

To renew his green card, Cervantes-Torres went to an immigration facility for fingerprinting. While there, immigration officials verified his green card and gave him a sticker, extending his green card through April 2013. These events further bolstered Cervantes-Torres's belief that his green card was valid, and his 2003 deportation was in error. Immigration officers who testified at trial could not explain

why officials extended Cervantes-Torres's green card and acknowledged that it appeared facially valid. And although Cervantes-Torres admitted at trial that he received and read the United States Citizenship and Immigration Services ("USCIS") letter denying his application for a new green card, his testimony indicates that he did not think the letter was a final determination. When Cervantes-Torres attempted to testify as to why the letter did not change his mind about his status, the district court cut him off. In short, Cervantes-Torres continued to think that his prior removal was a mistake and that he was residing in the country lawfully.

Finally, the majority notes that the extension sticker Cervantes-Torres received from immigration officials lasted only through April 2013. But this is also not dispositive. Cervantes-Torres received conflicting information from various official immigration sources. An immigration judge told him he was deportable because he was not carrying his green card, but he then was released and was not contacted by immigration authorities for another six years, when they put him on a bus to the border. Border patrol officers examined his green card at a valid port of entry and allowed him to re-enter the country. He lived for ten years without incident in the United States as—he believed—a card-carrying lawful permanent resident. He walked into a USCIS facility to renew his green card, which was verified and extended by USCIS officials. Cervantes-Torres thus believed that the denial of his green card renewal application was in error, based on a similarly erroneous deportation that, at the time of the district court's order denying coram nobis relief, even the government did not understand. On this record, a reasonable jury could find that Cervantes-Torres did not know he was in the country unlawfully.

The majority weighs the evidence and concludes Cervantes-Torres knew of his unlawful status. But others empaneled to serve on Cervantes-Torres's jury might come out differently. At this stage, it does not matter. The very fact that the record supports opposing conclusions about Cervantes-Torres's knowledge requires us to grant coram nobis relief. *Cf. United States v. Leonti*, 326 F.3d 1111, 1122 (9th Cir. 2003) (holding that to show a reasonable probability of a different result, the defendant "need only show a probability sufficient to undermine confidence in the outcome" (quotation omitted)). If the jury were properly instructed, and Cervantes-Torres were permitted to present his defense, there is at least a reasonable probability of a different result.

## B. The failure to give a *Rehaif* instruction rendered Cervantes-Torres's trial irregular and invalid.

Not only did Cervantes-Torres present significant evidence that he lacked the requisite knowledge to be convicted under § 922(g), but the record reveals that the failure to give a *Rehaif* instruction influenced every aspect of Cervantes-Torres's trial, "render[ing] the proceeding itself irregular and invalid." *United States v. Morgan*, 346 U.S. 502, 509 n.15 (1954).

Cervantes-Torres went to trial against the advice of counsel, who did not think that his belief he was a lawful permanent resident was a relevant defense. His attorney did not develop any of the evidence Cervantes-Torres presents in his coram nobis petition. Rather, his counsel waived the opening statement and, calling Cervantes-Torres as the only witness, conducted a limited direct examination during which Cervantes-Torres admitted that he was deported in 2003, that he re-entered the United States with his green

card, and that he owned the rifles and used them for hunting. When Cervantes-Torres tried to testify about his personal knowledge of his immigration status, his attorney, the prosecutor, and the court prevented him from doing so.

For its part, the government's case focused almost exclusively on proving that Cervantes-Torres was, in fact, in the country unlawfully. Closing arguments turned on a single question: Did Cervantes-Torres's green card make him a lawful permanent resident? Even though the court and counsel curtailed Cervantes-Torres's testimony about his lack of knowledge, his confusion about his status was nonetheless evident. So much so that the prosecutor felt the need to address it. After explaining to the jury that Cervantes-Torres's green card was legally invalid, the prosecutor erroneously instructed the jury that Cervantes-Torres's confusion about his status was irrelevant:

> [T]he government does not have to prove the defendant knew he was not allowed to reenter the United States. So to the extent he wants to suggest with his testimony that he was confused—because he still had a green card; right?—he was confused about whether or not he could reenter, that doesn't matter. The question is whether the law permits and the answer is no. And the evidence and the court's own instructions show that.[3]

The failure to give a *Rehaif* instruction thus infected Cervantes-Torres's entire trial. *See Apprendi v. New Jersey*,

---

[3] The court's jury instructions for § 922(g) were silent on the knowledge requirement.

530 U.S. 466, 476–77 (2000). If a two-day trial was necessary to dispel ambiguity about Cervantes-Torres's immigration status, it follows that Cervantes-Torres himself might be confused about whether he was in the country unlawfully. To use the majority's preferred standard, there is a "reasonable probability" that a properly instructed jury would find that Cervantes-Torres lacked the requisite knowledge to sustain a conviction under § 922(g). And the record demonstrates that Cervantes-Torres was convicted on an erroneous theory of guilt, a fundamental error that "rendered the proceeding itself irregular and invalid." *Morgan*, 346 U.S. at 509 n.15; *see also McClelland*, 941 F.2d at 1003; *Walgren*, 885 F.2d at 1424.

## III. This court's *Rehaif* precedent mandates relief.

We have rarely considered a *Rehaif* claim in the context of a writ of coram nobis. But our cases addressing *Rehaif* claims in habeas proceedings and on direct appeal instruct that Cervantes-Torres is entitled to relief. In fact, we have found *Rehaif* error based on far less. *See, e.g.*, *United States v. Werle*, 35 F.4th 1195, 1203–07 (9th Cir. 2022) (finding it plausible that a defendant did not know he was a felon when he admitted at trial that he was "convicted of felonies" because the defendant "served less than a year" of prison time for each of his two felonies).[4]

---

[4] Cervantes-Torres also presents more evidence of his ignorance than every *Rehaif* claim this court has denied. *See, e.g.*, *Gear*, 9 F.4th at 1047 (finding no "plain error" when "piles of evidence" showed the defendant was aware of his nonimmigrant visa including his stipulation at trial, his physical visa, and his admissions to DHS agents that he was present on a nonimmigrant visa); *United States v. Singh*, 979 F.3d 697, 729–30 (9th Cir. 2020) (no plain error when "uncontroverted evidence" established

Cervantes-Torres's *Rehaif* claim is unlike any we have ever considered. It presents not only the absence of a jury instruction that the defendant's knowledge of his status is an element of the crime, but an affirmative statement that the defendant's knowledge of his status is irrelevant. Indeed, that the prosecutor felt compelled to tell the jury *not* to consider Cervantes-Torres's confusion about his status demonstrates that the jury likely would have weighed it in Cervantes-Torres's favor. In short, Cervantes-Torres presents an undeniable *Rehaif* error. The majority's conclusion to the contrary deviates from this court's precedent and misconstrues the record.

Coram nobis relief is warranted when erroneous jury instructions "relieve[] the prosecution from its burden of proving an essential element of the offense," *McClelland*, 941 F.2d at 1003, and the district court's failure to provide a *Rehaif* instruction did precisely that. Even if we review for plain error, Cervantes-Torres's claim satisfies the standard. He spent over two years in prison because he owned hunting rifles; he now faces severe immigration consequences for the same. And yet the prosecution did not prove the essential element that distinguishes innocent gun ownership from criminal gun ownership: knowledge of his unlawful status.

that the defendant knew he was a nonimmigrant visa holder, including that the defendant personally filled out several applications for nonimmigrant visas and used his nonimmigrant visa to enter the United States 29 times in two years); *United States v. Michell*, 65 F.4th 411, 417 (9th Cir. 2023) (finding no plain error when the defendant "repeatedly stated" at trial "that he knew his DUI convictions made him a 'prohibited possessor' of firearms under federal law"); *United States v. Pollard*, 20 F. 4th 1252, 1256–57 (9th Cir. 2021) (finding there was "no probability" that defendant did not know he was a felon when the defendant served five years in prison for various felonies, he admitted that he was a felon, and "everything in the record" showed he knew about his status).

Cervantes-Torres has thus experienced all the punishment and prejudice of a criminal conviction, without ever being convicted of the crime. And indeed, if the jury had been instructed on the actual elements of the crime, there is more than a reasonable probability of a different outcome. This is an error of the most fundamental character that warrants the "extraordinary remedy" of coram nobis relief.

I respectfully dissent.